Machine Co. *v.* Compress Co.

---

MACHINE Co. *v.* COMPRESS Co.

*(Jackson.* June • 26, 1900.)

1. SUPREME COURT. *Will not set aside verdict on the facts, when.*

Unless the complaining party can show that the strongest legitimate view, adverse to himself, of which the evidence is susceptible, affords no support to the verdict, this Court will not set it aside on the facts. *(Post, pp. 194–200.)*

Case cited: Citizens' Rapid Transit Co. *v.* Seigrist, 96 Tenn., 120.

2. EVIDENCE. *Photograph admissible.*

Photographs of a wrecked building and machinery, taken immediately after the explosion that caused the injury, are competent evidence to show the condition of the premises and the extent of the damage inflicted, in any case where these matters are the subject of inquiry. *(Post, pp. 200, 201.)*

Case cited: Bruce *v.* Beall, 99 Tenn., 309.

3. WITNESS. *Inquiry as to collateral matters for purposes of impeachment.*

The answer of a witness on cross-examination as to a collateral matter is conclusive and cannot be contradicted or disproved for the purpose of impeaching him. *(Post, p. 201.)*

4. DAMAGES. *Measure of, for breach of contract.*

Only such damages as result naturally and proximately are recoverable for breach of contract, but these may include (1) such damages as result immediately and in the usual course of things from the breach of the contract itself, and (2) such damages as result from the breach when considered in connection with the special circumstances which existed at the time the contract was made, and which, according to the understanding of both parties, entered into and became part and basis of the contract. *(Post, pp. 201–217.)*

Cases cited: *McDonald v. Unaka Lumber Co.,* 88 Tenn., 38;
*Railroad v. Cabinet Co.,* 104 Tenn.; 568.

5. SAME. *Same.*

To render special circumstances existing at the date of making
a contract part and basis of the contract, and a proper matter
for consideration in estimating the damages for its breach, it
is not essential that those circumstances shall be expressly
referred to in the contract, whether it be written or oral, but
it is sufficient if they were known to both parties, and that
the contract was, to some extent, based upon them and made
with reference to them.  (*Post, pp. 206, 207.*)

6. SAME. *Same.   Case in judgment.*

A manufacturer contracted to furnish machinery and make
essential repairs upon the plant of a cotton compress company
by a fixed date.   The date fixed was, and was known by both
parties to be, the beginning of the season, which continued
during only a portion of the year, during which the plant could
be operated.   It was likewise known that it was the purpose
and expectation of the compress company to have its plant in
readiness for the beginning of the season.   The manufacturer
failed to complete the work within the time limited, and,
when he did complete it, the work and material were of such
inferior quality that an explosion resulted as a consequence,
and so wrecked the compress plant that it could not be put
in condition for operation during that season.

*Held:* The manufacturer was liable not only for damages to the
plant from the explosion, and the loss of the price of the
work he had done, but for the rental value of the plant
during the season of enforced idleness.  (*Post, pp. 189–194, 207,
208.*)

7. SAME.  *Same.*

The rental value of a compress during the season of its en-
forced idleness is the true measure of damages against one
whose negligence has wrecked it by explosion.  (*Post, p. 208.*)

8. CHARGE OF COURT.  *Does not leave construction of written con-
tract to the jury, when.*

A charge of the Court is not objectionable as leaving the con-
struction of a written contract to the jury, which merely in-

structs the jury with reference to extrinsic circumstances constituting the basis of the contract which they should take into consideration in estimating damages for its breach. (*Post, pp. 208, 209.*)

---

FROM SHELBY.

---

. Appeal in error from Circuit Court of Shelby County. L. H. ESTES, J.

McFARLAND & NEBLETT for Machine Co.

PERCY & WATKINS for Compress Co.

BEARD, J. The plaintiff in error, in the year 1897, was engaged in the iron foundry business in Memphis, Tennessee, and the Union Compress & Storage Co. owned at that time a plant erected at Clarksdale, Mississippi, for compressing cotton in bales for shipment to market. The power used by the latter company in doing this work was furnished by two sets of cylinders, in part steam and in part hydraulic, one of which was high and the other low pressure. In the winter of 1896-7 the low pressure hydraulic cylinder and some of the pipes communicating between it and the compress proper were permanently injured. This disabled the entire plant, and made it necessary for the compress company to have not only a new cylinder and new pipes, but also other

parts of its machinery repaired in order to put the compress in working condition for the season of 1897-8, which began at that point about the 1st of October. To this end this company entered into a written contract with the Livermore Foundry & Machine Co., which is in the words following, to wit:

"AUGUST 17, 1897.

"This contract between the Livermore Foundry & Machine Co., of Memphis, Tennessee, and the Union Compress & Storage Co., of Clarksdale, Miss., witnesseth:

"That the said Livermore Foundry & Machine Co., for and in consideration of a sum of money, amount herein mentioned, agree to furnish the necessary labor and material for the repairs on the compress machinery, to wit:

"To furnish one new cylinder head, drilled and fitted per old one.

"To furnish one new piston head, fitted with packing rings and springs, with additional metal added.

"To furnish one new low pressure hydraulic cylinder.

"New special bolts for steam cylinder head and rear end of both hydraulic cylinders.

"To repair cracked steam cylinder in best possible manner and make tight.

"To reline high pressure cylinder with seamless drawn tube, so as to be true and smooth.

"To furnish and set in place one piece of four-inch, extra heavy hydraulic pipe, 10 feet 9 inches long, and to bend same so as to conform to shape of old one.

"It is further agreed that the Livermore Foundry & Machine Co. shall take down and dismantle all above mentioned parts of machinery and ship same to Memphis without expense to the Union Compress & Storage Co., and upon completion of repairs at Memphis to return same to Clarksdale, Miss., and erect same in place without expense to the said Union Compress Co.

"The Livermore Foundry & Machine Co. agrees to complete the above mentioned repairs and press ready for service within the period of fifty-five days from the date of the contract.

"For the faithful execution of this contract the Union Compress & Storage Co. agrees to pay the Livermore Foundry & Machine Co. the sum of two thousand and thirty-four dollars on the following terms:

"One thousand dollars to be paid when repairs are delivered aboard cars at Clarksdale, Miss., and the balance, $1,034, to be paid within thirty days after the completion and satisfactory test of the work.

"It is further agreed that in the event during the progress of the work, or testing of the press, other work, repairs or changes not enumerated in this contract are made, same shall be paid for

by the Union Compress & Storage Co. at such rates and prices as may be agreed upon.

"The Livermore Foundry & Machine Co. agrees to allow the Union Compress & Storage Co. the sum of six dollars per ton f. o. b. Memphis for scrap iron, and copper at 8 cents per pound."

Although by this contract the work was to be finished and the various mechanical appliances were to be put in place, ready for the operation of the compress, within fifty-five days from its date, a much longer period elapsed before this was done. In the early part of November, however, they were adjusted, in part at least, and subjected to a test, which was unsatisfactory to Mr. Leach, who was on the ground as a skilled employee representing the plaintiff in error in placing the new machinery and in the experiment made. Finally, after material changes had been made under his direction, he notified the officers of the compress company that he would be ready to make another test on the 11th of November, and asked that he be supplied by the company with a sufficient working crew for this purpose, which was done. In making this test it was discovered that the defect or defects in the head of the hydraulic cylinder constructed by plaintiff in error which were discovered at the first experiment still existed, and that some additional work was required to correct them. This was done, and on the 12th of November a working crew was

again furnished to Leach, and the machinery of the plant was put in operation in the morning, and with stoppages for short intervals to make some immaterial changes, was continued in operation until about 4 o'clock in the afternoon, up to which time about 400 bales of cotton had been compressed. About that hour an explosion took place, inflicting serious damage on the plant itself and killing one of the employees of the compress company instantly and fatally wounding two others. Upon examination it was disclosed that the head of the low pressure steam cylinder, as well as that of the low pressure hydraulic cylinder, had blown out, and other parts of the machinery had been seriously injured.

Before the accident the compress company had paid $1,000 on the contract, but this payment was made with the express understanding that the compress company waived no right against the foundry company by reason of any breach of its contract. This action was brought to recover this sum, together with damages sustained by the company, for the injury sustained by the plant from this explosion, and for rental value of the compress during its period of enforced idleness following the accident, upon the theory that the imperfect and unworkmanlike cylinder furnished by the plaintiff in error was the occasion of the accident and loss. The trial of the case resulted in a verdict which is in these words:

21-p--13

"We, the jury, find for the plaintiff and assess their damage for injury and cost of repairing machinery and premises and replacing same, caused by breach of contract and cylinder explosion, $3,500; for money paid on contract, $1,000, with interest; for loss of rental value of compress caused by breach of contract and cylinder explosion, $3,000; total, $7,500.

"W. H. MONTGOMERY, *Foreman.*"

The first error assigned is that there is no material evidence to support the verdict of the jury. In considering this assignment, the well-settled rule is as announced in *Citizens' Rap. Transit Co.* v. *Seigrist,* 96 Tenn., 120, that in order to impeach in this Court a verdict approved by the trial Judge, the complaining party must take as true the strongest legitimate view of the testimony against him, and be prepared to show that it affords no support to the verdict. So that if the testimony in a given case, viewed from different points of observation, should suggest two theories, both of which may be naturally deduced from it, one of which, if adopted by the jury, makes reasonable their verdict and the other would leave it without material support, this Court will assume that the one which sustains the verdict was the one adopted by the triers of fact and maintain their finding.

Bearing in mind this rule and its corollary, we

will now examine briefly the facts as disclosed in the case. But, before doing so, it is proper to give some idea of the location and operation of these cylinders and their connections. They were placed in a horizontal position. The low pressure steam cylinder was in the rear and the hydraulic cylinder manufactured by the plaintiff in error was immediately in front, the two being joined firmly together by bolts. Inside these cylinders was a piston common to both. By the use of a lever connected with proper valves in these cylinders, this piston was moved back and forth. Steam was let in behind the piston, which, as it expanded, pressed it forward, and as this movement progressed its plunger came in contact with a volume of water contained in the hydraulic cylinder, and this was moved up toward its head, being pressed against it with a force equal to from 350 to 500 tons, as might be required, which, through pipes communicating with the compress, began the work of compressing a bale of cotton, which was completed by a still more powerful force furnished by the high pressure steam and hydraulic cylinders. As has already been said, the heads of these two low pressure cylinders, as the result of the explosion, were blown off, and the thory of the plaintiff below was that this resulted from the fact that the defendant had unskillfully cast the cylinder; that its head was of inferior material, and so imperfectly and unskill-

fully done that it would not stand the strain put upon it in the careful operation of the machinery, and that, much before it had received the full force of the strain it should have borne if properly constructed, the head blew off, and thus relieved from resistance, and under the influence of the propelling steam in its rear the piston moved forward with such energy as to break off the head of the steam cylinder.

The record shows that, after the casting was done, Garside, who was the manager of the Livermore Foundry & Machine Co., found on examination, what he supposed shallow sand holes in the head of the cylinder, which he says did not weaken it, but did give it rather an ugly and unfinished appearance, so he had placed over this head a solid brass plate, covering its entire surface, at an expense to his employer of $150. To fix this cap or plate over this head, some forty-five holes were bored into the upper rim of the cylinder, and the cap was fitted on with bolts carried into these holes. Mr. Garside says, "When the job was done it looked like a good piece of work, and it was shipped down there." And again he says: "I did not think that the drilling there would weaken it to any extent that would be dangerous; that would be anywise dangerous."

As has been stated, after the cylinder was placed, and the other machinery was adjusted to it, Leach, who was sent to Clarksdale as the rep-

Machine Co. v. Compress Co.

resentative of plaintiff in error to do this work, subjected it to a number of tests. When the first of these was made and pressure was put on this cylinder, according to the testimony of a number of witnesses, jets of water burst out all around the head, where it is claimed the imperfections were. This experiment was altogether unsatisfactory to Leach, so after expending several days of labor in undertaking to remedy the defects, he informed the officers of the defendant in error he was ready for another test. When, during this test, pressure was once more applied it was found that water still ran in jets from holes around or in this head.

While thus operating the machinery in compressing cotton with a crew of the compress company, furnished to him for the purpose and working under his direction, according to Cutrer, a witness, "He would stop every little while and do a little work." After the first test he had said to Campbell that he would make an effort, by the use of countersunk bolts, to stop the leaks, and if this failed his company would have to make a new casting, and during the progress of this second test he said to Cutrer that he was afraid he might not be able to remedy it, and the Livermore Co. would have to cast a new cylinder, "but he would continue his work upon it and see if he could fix it."

The head of the hydraulic cylinder was exam-

ined by a number of persons, witnesses in the case. Shipway, superintendent of the cotton compresses for many years in Memphis, was one of these persons, and he testified that it was "honeycombed and defective;" that the effect of attaching the brass cap with bolts carried into the holes bored in it was to weaken it still more; that this cap could serve no useful purpose, but must have been put on to cover up blow-holes or to prevent them from showing or leaking water.

Morrison examined this head and found it made of porous, slaggy metal and very imperfectly constructed, and Walsh, a practical machinist and engineer of many years' experience, who also examined the head, pronounced it "not a workman-like piece of work at all," and that the drilling of the holes for the cap diminished the resisting force of the metal; and Martin, a witness for defendant below, on cross-examination admitted that if it leaked as described by other witnesses he would not regard it as a sound piece of work. All these parties agree that never before had they known a brass cap on a cylinder head.

It is evident, without further detail, that there was material testimony which, the jury accepting, warranted them in believing that this hydraulic cylinder, at that place where it was to receive the greatest pressure, was of infirm material, poorly cast, and afterward diminished in strength by the

effort to cover its defects. But were they authorized to infer that this defective heading was the cause of the explosion?

That the initial explosion was not in the steam cylinder we think the jury were authorized to conclude. The steam cylinder had worked for years satisfactorily, and up to the moment of the accident gave no evidence of weakness. The explosion, so far as the record shows, did not dislodge it from its place, though its head was blown out, while this head, together with the hydraulic cylinder, were driven forward a distance of several feet. Upon examination by the expert witnesses, the metal in the former was pronounced perfect, while that in the latter was found to be imperfect by the witnesses named.

In addition, we think the testimony in the case warrants the contention of the plaintiff below that if the initial break had been in the steam cylinder, its necessary effect would have been to release the piston from the pressure upon it from behind and thus have at once relieved the head of the hydraulic cylinder from the strain upon it, and whatever other damage might have been done to the latter, this would not have blown off. On the other hand, we can well see that the jury might naturally have inferred that the break first occurred in the head of the hydraulic cylinder, which, unable by reason of inferior metal used and imperfect construction, to longer

resist the strain put upon it, gave way suddenly, and the piston, thus relieved, under the impulse of a steam pressure of from 350 to 400 tons, sprang forward with tremendous violence, dragging after it the head of the steam cylinder and at the same time carrying with it the hydraulic cylinder.

It is true there was a suggestion by the defendant below, based upon the testimony of Leach, that the accident was the result of carelessness on the part of the engineer in operating this machinery, resulting in the head of the piston being driven against the head of the hydraulic cylinder, thus weakening it until disintegration of the metal took place, followed by this explosion; but it is evident this theory, as was the other, as to the inital point of explosion, propounded by the defendant below, was discarded by the jury and they accepted, rather, that of the plaintiff. It was for that tribunal to pass upon these respective theories, and, finding that the one adopted by the jury was reasonably deducible from the evidence, we cannot interfere with the verdict.

Second, it is assigned for error that the trial Judge improperly admitted photographs of the compress and the wrecked machinery, taken after the accident. These photographs were taken by the witness immediately after the accident, and served to give the jury, with the explanation of them by the witness, a more correct idea of the

condition of the wreck than they would obtain from mere description without their aid. Even if proper objection had been made, which we do not find in this record, yet it could not avail, as we hold they were competent to go to the jury. *Bruce* v. *Beall,* 99 Tenn., 309; *M. R. & T. R. R.* v. *Magee,* 49 S. W. R. (Texas), 929.

Third, it was not error on the part of the trial Judge in declining to permit defendant below to ask Campbell, one of the parties for whose use the suit is brought, on cross-examination, what he paid Mrs. Cutrer for her interest in this suit. There was no issue in the case which made this inquiry pertinent. When the husband of Mrs. Cutrer was on the stand, within the freedom of cross-examination, he might have been asked as to this matter, but being a collateral matter, his answer would have concluded the investigation.

Fourth, the trial Judge in his charge said to the jury if they found that the loss of the use of the compress was due to the breach of contract of the defendant to furnish the machinery according to the contract, yet such loss could not be considered or allowed by them unless they also found that the defendant, at the time the contract was made, had notice, either from it or otherwise, that such loss of use would ensue from nonperformance by it of its contract. He then adds:

"But if you find that it was in the contem-

plation of the parties to the contract, by the terms of the agreement or by direct notice, that in the event of default by the defendant to furnish suitable and proper machinery, the loss of the use of the compress would necessarily ensue; and if you find as a necessary result of the explosion—if you find the explosion due to the negligence of the defendant in furnishing a defective cylinder—that the plaintiff was deprived of the use of the compress, plaintiff would be entitled to recover the rental value of the compress, as shown by the evidence, during the period in which it was so deprived of its use."

It is insisted that there is error in this last paragraph. Before considering this assignment, it is proper to say, in reply to another objection of plaintiff in error, that the declaration averred a loss of rental use or value of the compress for the season of 1897-8 resulting from the breach of contract on the part of the foundry company, and evidence was adduced tending to show that after the accident it was impracticable to supply the compress with machinery in place of that destroyed so as to enable it to do any work during that season, and also what the compress could have done with good machinery, and its rental value.

In the instruction just quoted the trial Judge was applying in brief term the rule laid down by Alderson, Judge, in the now celebrated case

of *Hadley* v. *Baxendale,* 9 Exch., 341, which is in these words:

"Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered, either arising naturally, *i. e.,* according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach of it. Now, if the special circumstances under which the contract was actually made were communicated by the plaintiff to the defendant, and thus known to both parties, the damages resulting from the breach of such a contract which they would reasonably contemplate would be the amount of injury which would ordinarily follow from a breach of contract, under these special circumstances, as known and communicated."

Perhaps no rule of practice has provoked more attention from Courts and text-writers, or been more uniformly adopted, than this. It has been with singular unanimity recognized as resting on the sound principle that a party suffering from a breach of contract on the part of another is entitled to recover full compensation for the loss sustained thereby. It is true he can recover only

those damages resulting fairly and naturally from the breach, but such as may be supposed to have been within the contemplation of the parties as the probable result of the breach are certainly of that character. Mr. Sutherland, in his work on Damages, Vol. 1, p. 79, says: "There is no relaxation of the rule confining the recovery to damages naturally and proximately resulting from the breach in cases where there are such known special circumstances. Indeed, some strictness exists to confine the recovery to the immediate consequences. The general principle of compensation is that it should be equal to the injury. It is a rule based on that principle that the amount of the benefit which a party to a contract would derive from its performance is the measure of his damages if it be broken. It is a rule of interpretation, too, that the intention of the parties is to be ascertained from the whole contract, considered in connection with the surrounding circumstances known to both parties. If it appear by these surrounding circumstances that the contract was entered into, and known by both parties to be entered into, to enable one of them to serve or accomplish a particular purpose, whether to secure a special gain or to avoid an anticipated loss, the liability of the other for a violation of the contract will be determined, and the amount of damages fixed, with reference to the effect of the breach in hindering or defeating

that object. The proof of such circumstances makes it manifest that such damages were within the contemplation of the parties. Looking alone at the contract . . . . silent as to such circumstances . . . . such damages sometimes appear to arise very remotely and collaterally to the undertaking violated. But when the contract is considered in connection with the extrinsic facts, there is established a natural and proximate relation of cause and effect between the breach of the contract and the injury to be compensated."

Mr. Sedgwick, in his work on Damages, Vol. 1, Sec. 149, after an examination of the cases in which *Hadley* v. *Baxendale* has been reviewed and applied, in summing up the general result, says: "On the whole, it will be found that the general tendency of judicial opinion in the United States, as well as in England, is that · no new rule of damages has been introduced; that the plaintiff recovers such damages as are approximate and natural, and that, in ascertaining what are natural consequences, we must take into the account all the circumstances of the case, including all facts bearing on the question which were in the knowledge of both parties, even though these be such as would not necessarily, without such knowledge, enter into it."

It would be a waste of labor and space to review the cases in which this rule has been applied—in some with a liberality which we

might not feel called upon to sanction, and in others with more narrowness of construction, but in all approved. Among the English cases are *Cary* v. *Thames Iron Works,* L. R., 3 Q. B. 185; *Elbinger* v. *Armstrong,* L. R.; 9 Q. B. 475; *Grebert* v. *Nugent,* L. R., Q. B. Dec., Vol. 15, 85, and *Agins* v. *Great Western Col. Co.* L. R., 1 Q. B., 1899, p. 419; and by the American Courts in *Howard* v. *Stillwell Mfg. Co.,* 139 U. S., 199; *Willerbee* v. *Meyer,* 155 N. Y., 446; *Graves* v. *Ray Co.,* 69 Mo., 574; *Vanwinkle* v. *Wilkins,* 8 Ga., 93 (S. C., A. S. R., 299); *William* v. *Is. City Milling Co.,* 25 Oregon, 573; *Vicksburg & Meridian R. R. Co.* v. *Ragsdale,* 46 Miss., p. 482. The rule was referred to with approval by this Court in *McDonald* v. *Unaka Timber Co.,* in 88 Tenn., 38, and was directly applied at the present term in the case of *Railroad* v. *Cabinet Co.,* 104 Tenn., 568, opinion by Justice Caldwell.

But it is argued that, granting the authority of this rule, yet the present case was not a proper one for its application; that the information given plaintiff in error was not sufficient to put it on notice of the extraordinary damages it might incur from a breach of its contract. No case holds in order to put this rule in operation that the party invoking it must have said to the other party, at the moment of making the contract, he would claim these damages for a breach,

but it may be conceded "the knowledge must be brought home to the party sought to be charged under such circumstances that he must know that the person he contracts with naturally believes that he accepts the contract with the special condition attached to it." *Column S. M. Co.* v. *Nettleship,* L. R., 3 C. P., 499. Or, as is said by Mr. Sedgwick, "notice must be more than knowledge on the defendant's part of the special circumstances; it must be of such a nature that the contract was to some extent based upon the special circumstances."

Yet, thus interpreting the rule, we think the testimony warranted the trial Judge in giving it in charge to the jury. On this point it was as follows. Mr. Cutrer, president of the company, said:

"Mr. Leach thoroughly understood that was the purpose in view, to fit the compress and have it ready in time to take up the cotton as it came in. Mr. Leach thoroughly understood, and we discussed together the necessity for having this work done in time to press cotton for the season of 1897, and that if his company took the contract, they were to take it and complete the work in time for the crop of 1897."

Mr. W. S. Campbell was asked: "What information, if any, did you impart to the Livermore Foundry & Machine Co. of the necessity of having the work contracted for completed in time,

and as to the uses to which the press, when repaired, was to be put?"

*A.* "Well, I of course impressed the fact upon him that we wanted it completed in time to press cotton that would begin to come in to us, and, in fact, they fully understood the nature of the contract and the necessity for having it in shape by the time the season was open for compressing."

But it is also said the trial · Judge was in error in saying to the jury upon the case which this testimony tended to prove, that for its period of enforced idleness plaintiff below could recover the rental value of the premises. There was no error in this. *Schuttle* v. *Brakelin,* 80 N. Y., 156; *White* v. *Mosley,* 25 Mass., 356; *Keller* v. *State,* 66 Md., 61; *Chicago City R. R.* v. *Harrison,* 81 Ill., 218; *Dixon Woods Co.* v. *Phillips Glass Co.,* 169 Pa. St., 167.

But it is said that the trial Judge, in the clause of his charge set out above, erroneously left it to the jury to construe the written contract between these parties. An examination of the whole clause, we think, shows this criticism to be highly technical. There was no ambiguity in the written contract or controversy as to its execution or provisions. The issue to which the attention of the jury was then being called was, assuming that the foundry was responsible for the explosion and the enforced idleness of the com-

press, whether at the time of the making of the contract both parties had in view a prompt execution of the contract in order to have the compress in order for the opening of the cotton season, and the loss which would ensue from a failure in promptness in that regard. The written contract did not embody these matters; they were to be ascertained from extrinsic evidence, and might rest in an agreement oral in character or might depend entirely upon a notice from the compress company to the foundry, necessarily inferable from the circumstances known to both parties. It was to this feature of the case, and not to the written contract, the Circuit Judge was addressing himself.

Other errors are assigned, but as they are unimportant, they are disposed of orally.

All are overruled, and the judgment is affirmed.

---

OPINION ON PETITION TO REHEAR.

BEARD, J. We have been earnestly asked to reconsider this case upon the suggestion that we have carried the doctrine of *Hadley* v. *Baxendale* further than is warranted by principle or authority, and in so doing have countenanced an application of it which will prove of grave import to manufacturers in the State.

21 P—14

Before examining this point it is well to re-
peat that the case at bar is one where a manu-
facturer agreed with a compress company to con-
struct and put in proper place a hydraulic cylin-
der within a fixed period, with full knowledge
that it was an essential part of the compress
machinery, and that the time for its completion
and erection was named with regard to the be-
ginning of a limited season, during which the
compress could alone be made profitable, yet who
delayed delivery much longer than the time
agreed upon, and then furnished one which ex-
ploded under proper tests, inflicting such injury
to the plant as to put it in a condition of en-
forced idleness for the entire season. In such a
case the question is, What is the owner of the
compress entitled to recover against the delinquent
manufacturer? That he should recover something
is evident. He is without blame, while the party
with whom he has contracted, in violation of a
legal duty to supply a cylinder of good material
and workmanship (*Overton* v. *Phelan,* 2 Head,
445) is at fault. Under these conditions, it will
be conceded the general rule is, the loss must
fall on that one whose wrong has brought it
about, and the party injured shall recover dam-
ages commensurate with the loss sustained.

In the case at bar, the compress was erected
by its owner for compressing cotton for shipment
to market. It was valueless for any other pur-

pose, and was only valuable for this for a period running from about the 1st of October to the 1st of June of current years. Lving idle during that time, its profit or rent earning capacity to its owners was destroyed. The record showing that it was disabled from work during this period through the fault of the plaintiff, what damages are the owners entiteld to recover?

In cases like the present it is certainly true the weight of authority is that for his indemnity the party disappointed of prompt delivery may recover of the delinquent manufacturer the rental value of his property between the dates when the article contracted for should have been delivered and the date of its actual delivery. This much we understand to be conceded in the petition for rehearing, but the insistence is that the principle authorizing a recovery in such a case should not be applied where the enforced idleness is the result of an unexpected accident from latent defects in the work supplied by the manufacturer, and covers a period of time so indefinite as a "season's business." It is said by counsel for petitioner that in the case first put the time of default is certain, and as the manufacturer can calculate with a degree of certainty what the claim against him will be in case of default, it may very well be said in the want of prompt delivery he contemplated, as the natural result of his failure, a loss to the owner of the rental value of

his property during the period such failure contin-
ues, and his liability for such loss as the natu-
ral result of his breach. But it is insisted it is
otherwise · where a stoppage is put to machinery
during a season's business by such an unexpected
and unusual occurrence as the explosion of a me-
chanical contrivance furnished by him. In either
case, however, there is a breach of his contract.
In one he is bound to deliver on time, and fails
to do so for several days or weeks; in the other
he undertakes to manufacture and put in place,
within a given period, a piece of mechanism of
sound material and good workmanship, that will
stand the strain necessarily imposed upon it, and
instead supplies one constructed of such improper
substance and in a manner pronounced by experts
to be so unworkmanlike as that it explodes and
makes a useless wreck of the plant for a whole
season. If liable in the one case, upon what sub-
stantial ground can liability be averted in the
other? In neither case is he liable for a loss of
profits, for fluctuation in business, changes in the
price of labor, and unforeseen accidents to ma-
chinery make this as a measure of damages too
uncertain. It is otherwise, however, as to the
loss by the owner of the use of his property
during the period of inactivity. The value of
this use is the rental value of the property, and
this is as well ascertainable for six months as
for six weeks, for a season as for a fractional

part of a season. We can see no reason for discriminating between the two cases. For the shorter period he is held responsible because the loss, being necessarily, under the facts of the case, within the contemplation of the parties, as the natural and proximate result of his act, so for the longer period he is equally liable on the same ground.

It is true that in a claim for unliquidated damages the application of this rule, or, in fact, of any rule, may not always do exact justice to both parties; all the Courts can do is to approach this result as near as possible. In all such cases the rule of right is that the party who has suffered is entitled to be placed as near as possible in the same plight he would have been if the contract had been performed by the other party, this, however, to be accomplished within legal limitations.

In the case of *Abbott* v. *Gatch,* 13 Md., 314 (S. C., 71 Am. Dec., 635), the Court held that the measure of damages for failure to erect a mill at the time stipulated in the contract is its fair rental value during the time the owner is thus kept from its use. In discussing the rule the Court made the following observation: "The inquiry here is, What standard of value for the loss of time shall we apply? We cannot adopt any estimate of profits that Abbott might have realized from working the mill, because these were merely speculative, depending on the quantity of

flour it might grind, the fluctuation of the market as to prices of flour and grain, and the remote contingencies of his being able to procure wheat, labor, and fuel, as well as the continuance of the mill in necessary order, free from accidents and loss of time from other causes. . . . . Considering the uncertainty attending the milling business, the difficulty of defining a safe guide for profits, we are of the opinion that a fair rent is the most reasonable standard of the defendant's loss by reason of plaintiff's failure to complete the mill. This we take to be consistent with well established principles."

This rule is also applied in a finely reasoned opinion delivered by Selden, J., for the Court in *Griffin* v. *Colver,* 16 N. Y., 489 (S. C., 69 Am. Dec., 718), where, after examining and distinguishing the cases, it was held that speculative profits as a basis for recovery would not be considered, but the measure of damages in a failure to furnish an engine by a stipulated time is the value of the use during the period of delay.

In *Clifford* v. *Richardson,* 18 Vt., 620, the defendant put machinery into the plaintiff's mill in an unskillful manner, whereby he lost the use of his mill for a long space of time and was put to great expense in repairing the machinery. It was held that both the loss of the use of the mill and the expense of repairs were to be com-

pensated for in damages. In this case, though, the Court seemed to allow as competent, evidence of what the mill could have earned. On this last point we are not to be understood as approving its holding; otherwise, it is authority for the general proposition that the mill or compress owner is entitled to be placed, as far as a money recovery can, in the same condition as he would have been if the other party had not breached his contract.

*Goodloe* v. *Pryor,* 9 La. Ann., 273, is another authority to the same point. It is true this was a case arising under the civil code of Louisiana, which in many essential features differs from the common law. But in this regard that code adopts the rule for the measure of damages in cases like the present, almost in the words of *Hadley* v. *Baxendale*. After providing that "any person is responsible for the damages he occasions, not merely by his act, but by his negligence, his imprudence or his want of skill," it then provides that "when the object of the contract is anything but the payment of money," and the party committing the breach is not guilty of fraud or bad faith, "he is liable only for such damages as were contemplated, or may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract." Under a contract to build and put in operation a sugar mill and steam engine on the defendant's place,

the Court found the plaintiffs were guilty of negligence in the execution of their contract, by making a right-hand instead of a left-hand engine; that the castings had defects which caused their breakage when the mill was put in operation, and that they were guilty of a want of skill in the erection of the sugar mill, resulting in serious loss to the defendant. The Court sums up by saying: "Under the law and evidence, we consider the defendant entitled to recover damages for his loss · of crop and extra wages paid in consequence of the delay for alterations and repairs in putting the sugar mill and steam engine in operation, said delay being caused by plaintiffs' fault and their failure to execute their contract."

As a matter of course, the condition precedent to such a recovery is that the manufacturer had notice, at the time he made the contract, of the purpose his machine was to serve and of the circumstances requiring a prompt execution of his contract. When these conditions do exist, then the losses which result from his default are within the contemplation of the parties and cannot be called accidental, but are incidental to and flow naturally from the breach.

This rule of law, together with its application to this case, being established, the only question open is, Is there any material evidence to show the rental value of this compress for the season? We do find such evidence, which, even if so

slight as is insisted, warranted the inference of value drawn by the jury.

It is also urged that we were in error in our ruling on the action of the trial Judge in declining to let the witness, Campbell, state what he paid Mrs. Cutrer for her interest in the present suit. Mrs. Cutrer was an important witness for the plaintiff below. It is said the purpose of the defendant below in undertaking to elicit information from Campbell as to this transfer from Cutrer and wife in the subject of the litigation was to affect Cutrer's credit as a witness with the jury. We repeat as to this that when Cutrer was cross-examined he might have been asked as to this transfer, but, whatever his answer, it would have concluded the inquiry, because made with regard to a matter collateral to the issue. If, however, independent of the fact of transfer, Cutrer had, under the pressure of cross-examination, denied that he had a strong bias for the plaintiff in the suit, according, at any rate, to some authority (1 Wh. on Ev., Sec. 561) he might then have been contradicted by evidence of his own statements to the contrary or other implicatory acts. But we find no warrant for the course adopted in this case and still think the action of the trial Judge in this regard correct.

After a careful reconsideration of all the assignments of error, we are unable to discover any reason for a change in the conclusion originally announced by us, and the petition for rehearing is therefore dismissed.