## MRS. ANNIE O. TANNER v. INDEPENDENT LIFE INSURANCE CO. OF AMERICA.

Western Section.   March 23, 1928.

Petition for Certiorari denied by Supreme Court, May 26, 1928.

Albert G. Riley, of Memphis, for appellant.
Ralph Davis and R. R. Bond, of Memphis, for appellee.

SENTER, J. This is a suit on a policy of life insurance issued by the defendant insurance company on the life of Allen A. Tanner, in which Annie Tanner, the mother of the deceased, was named the beneficiary.

The answer admits the death of Allen A. Tanner, but relies upon the following provision contained in the policy:

"This policy shall be incontestable from date of issuance, except for nonpayment of premiums, actual and intended fraud, or for engaging in military or naval service in time of war, without permission from the company; if insured die by his or her own hand within one year from date thereof, whether sane or insane, or resulting from a crime or any attempt thereat, only one-half of the premium actually paid to the company will be the company's liability hereunder."

It is conceded that the insured lost his life by being shot to death by one Robert Boyd, a negro, on a plantation in the State of Mississippi.

The only question in the case, is as to whether the death of the deceased was the result of his being shot while committing a crime or attempting to commit a crime.

If, at the time the deceased met his death, he was committing a crime or attempting to commit a crime, and his death resulted from that act, then, under the provisions of the policy as above quoted, the recovery would be limited to one-half of the premiums paid on the policy. The policy was issued on December 15, 1924, and the amount of premiums paid on the policy from the date of its issuance, to April 3, 1926, the date of the death of Allen Tanner, amounted to $16.75, and the liability would be one-half of that amount, $8.38, and which amount the defendant tendered and paid the same into court, and said tender was made prior to the bringing of the suit.

On the motion of complainant the case was tried by a jury, and the only issue of fact submitted to the jury was:

"Q. Did Allen Tanner die as the result of a crime or an attempt thereat? A. No."

Upon this verdict the Chancellor decreed a judgment in favor of complainant and against the defendant in the sum of $530, the amount of the policy sued on, with interest thereon from the date of the filing of the suit, amounting to the sum of $37.10, making a total judgment of $567.10, and directed that the $8.31 paid into court by defendant under its plea of tender, be applied to the costs.

The defendant filed its motion for a judgment in its favor, and a dismissal of the suit, or a judgment non obstante veredicto, and a motion for a new trial. The motion for a decree non obstante veredicto, and the motion for a new trial were overruled and disallowed by the court, and the decree rendered on the verdict of the jury, as above set forth.

To this action of the court, defendant prayed and was granted an appeal to this court.

The first assignment of error challenges the action of the court in overruling its motion for a judgment notwithstanding the verdict of the jury, and in overruling its motion for a new trial. By the second assignment of error it is said there is no evidence in the record to sustain the verdict of the jury. The third assignment of error is directed to the charge of the court on the question of the alleged failure of the court to define to the jury, or to state the elements of crime under the proof and under the provisions of the policy.

The first and second assignments of error present but the single question, "that there is no evidence in the record to sustain the verdict of the jury."

Appellant in its brief frankly concedes that the case is not tried de novo in this court, and that in considering the evidence this court must take the strongest legitimate view of the evidence against appellant, including all reasonable inferences to be drawn from the facts, and that if there is any evidence, when thus considered, to sustain the verdict, it cannot be disturbed on appeal by this court. (Citizens Rapid Transit Co. v. Seigrist, 96 Tenn., 118; Machine Co. v. Compress Co., 105 Tenn., 187; Wilson v. Alexander, 115 Tenn., 125.)

It therefore becomes necessary to review and analyze the evidence in order to determine if there is any evidence to sustain the verdict of the jury.

The trouble resulting in the death of Tanner occurred on the Brooks plantation in Mississippi. All the witnesses introduced by the defendant in support of its plea that the death of Tanner resulted from a crime or an attempted crime, were negro men. It appears that Tanner entered the quarters provided for the day laborers as living and sleeping quarters on the Brooks farm. The first witness for the defendant was Will Latimer. He stated that he was present in the room when Tanner entered, and that he was engaged in playing a game of cards with Seaman Watkins, and one of the Hoskins boys, the three of them were engaged in a game of cards, and that when Tanner came into the room he engaged Robert Boyd in a dice game, shooting craps; that Tanner was in the house about thirty minutes, and that Boyd had won a $1.50 from Tanner in the dice game, and that Tanner got up and told Boyd to give him the $1.50 quick before he shot him, and pulled his pistol out of his bosom, and that Boyd handed him $1 and "reached his hand in his pocket to get the four bits," and that before he could get the money out of his pocket Tanner shot Boyd, and after shooting him started out of the house, and that Boyd followed him out, and he heard him shoot him on the outside, but did not see it. This witness stated on cross-

examination that after losing the fifty cents Tanner and Boyd discontinued the game, and that Tanner produced a quart bottle of whiskey and gave them all a drink from the bottle, and then again began shooting craps with Boyd and lost to Boyd another dollar, and that it was at this point Tanner drew his pistol and shot Boyd, and then went out of the house, where he heard two shots fired but did not see the parties.

Seamon Watkins, colored, the next witness for defendant, claimed to have been present, and stated in substance, that he was standing in front of the door and that he saw Tanner and Boyd engaged in a crap game, and that the other men in the house engaged in a game of cards; that "the colored fellow beat him out of a $1.50, the white fellow got up, pulled his pistol out and told him to give him the $1.50, said if he didn't he would kill him, and then the pistol fired, and the white man stepped out of the door," that Boyd followed him out with his hand behind him and the white man (Tanner) pointed his pistol at him and they both began shooting. He stated that Tanner was in the house when he got there, and it was about thirty minutes after he got there before the shooting occurred. He denies that Mr. Douglas, a white man, was there, or that he saw Mr. Douglas there, or near there. He stated that after the shooting he went with Mr. Randall to the storehouse, but denied that he discussed the matter with Mr. Randall at that time, but admitted that later Mr. Randall talked to him about it, and that he told Mr. Randall that the parties were gambling, shooting craps. He stated that both parties were shooting after they got out of the house but did not state the number of shots. He denied that he had signed a statement at the request of Mr. Randall, and denied that he had refused to sign a statement, and denied that he had been asked to sign a statement.

Thornton Taylor, colored, was the next witness in behalf of defendant. This witness stated that on the day of the shooting the witness sold to Allen Tanner a pistol for $20; that he was in the house where the trouble occurred, and that after selling Tanner the pistol, Tanner and Boyd began shooting craps; that Tanner had a quart of whiskey when he came into the house and gave all the boys a drink from the bottle; that besides himself, there were present at the time, Will Latimer, Seamon Watkins, Floyd Young, Talmer Hoskins and Robert Boyd. According to this witness the game of craps was interrupted for a few minutes when Tanner produced the quart of whiskey, and after all present had partaken of the whiskey Tanner and Boyd again began shooting craps. He stated that he did not see the shooting, but left the house and left Tanner and Boyd shooting craps and he went outside where there was a game of baseball between two negro teams playing, and that when he heard the first

shot fired he ran and did not see any of the shooting. On cross-examination this witness stated that Tanner was in the house two or three hours before the shooting occurred, and stated this positively. He also stated that he knew Seamon Watkins and that Seamon Watkins was playing cards in the house. On cross-examination the witness was asked if he knew Mr. Douglas, and stated that he did. He was asked if he ever talked to him about this matter, and stated that he had not, and had never made any statement either to Mr. Douglas or any other white man. He also stated that he had been out of the house and on the ball grounds about fifteen minutes when the first shot was fired. This was all the evidence offered by the defendant.

The depositions of J. A. Riddell and W. L. Douglas were offered in evidence by the complainant. Riddell was a deputy sheriff and also the chief of police of the town of Drew, Mississippi; that he reached the scene of the trouble a few minutes after it occurred. He stated that he found Allen Tanner lying at the back of the house dead, and the negro, Boyd, was shot, and they carried him to the commissary at the time. That there was a pistol lying somewhere near where Tanner was lying, and near his side; that he examined the pistol and found that there was one empty chamber, or an empty shell in the pistol, and five loaded chambers; that he also examined the negro's pistol and found that there were four empty shells in it and two full; that all of the empty shells in both pistols had the appearance of having been recently discharged. He stated that he had a conversation with two of the negroes after the shooting, Floyd Young and Thornton Taylor. He was not permitted to state what Floyd Young said to him, because Young had not testified. He stated that these negroes told him that Tanner came into the house where there was a bunch of the negroes gaming, and collected a bill owing to another man, and that Tanner asked Thornton Taylor to sell him the pistol; that Tanner gave him $20 for the pistol and that Tanner was fooling with the gun and accidently shot the negro, Boyd; that when he shot Boyd that Boyd "just went wild," he said; "just went after him, pulled his pistol;" that Tanner "grabbed Boyd and told him he didn't go to shoot him and they scuffled plumb out of the door, and a shot or two—there was one shot more fired somewhere in the scuffle, and he broke himself from him and went to running and then these negroes got out of the way." On cross-examination Mr. Randall stated that the conversation just related took place "two or three weeks after the accident;" that he didn't see anybody that could tell him about the trouble that night; that the negro was not dead when he got there, but that Tanner was. He stated that Mr. Douglas, a white man, brought these negroes to him about two weeks after the shooting, telling him that the two negroes "saw the whole thing."

The court admitted this evidence only insofar as Thornton Taylor was concerned, on the ground that it was competent to prove the inconsistent statement made by Thornton Taylor. This witness also stated on cross-examination that Robert Boyd was not dead at the time he got there, and that Boyd talked to him "and he told me he tried to kill him, but didn't say what the man done to him or anything else." He stated that the negro said: "I am a dead negro, I tried to kill him but I didn't kill him." He also stated that the negro had two shots, both in his stomach, and died in about an hour, or an hour and a half. He further stated that he searched for whiskey in the house and did not find any, and that he did not smell whiskey on the breath of either of the parties, Tanner or Boyd. He stated that Boyd was a whiskey negro (meaning a whiskey seller.)

Mr. Douglas stated that he was a carpenter and worked on the Brooks plantation; that on the afternoon of the trouble there was a negro ball game among the farm hands, and that he was present at the ball game when Tanner was killed, that he saw Tanner when he first drove up in front of the house, and that in a few minutes after Tanner entered the house he heard the report of a gun or pistol; that Tanner drove up in an automobile and went into the house, and had been in the house just a few minutes when he heard the report of the pistol, and immediately, a few seconds later, Tanner came out of the house running, and the negro, Boyd, came out of the house running after Tanner and shooting at him; that he did not see a pistol of Tanner at that time; that he was running and the negro was running after him and shooting at him until Tanner fell; that he did not see Tanner attempt to shoot the negro at all; that after Tanner had fallen he went to him, but saw the negro running around the corner of the house and he then ran to cut him off, and after he got around the corner of the building the negro had fallen to the ground. He stated that he went back immediately to where young Tanner had fallen; that he did not smell any whiskey; that he saw a pistol lying by the side of Tanner; that he examined it, and there was one empty shell in the pistol and five others which had not been fired; that the negro's pistol showed four empty shells. This witness also stated that he had a talk with Floyd Young and Thornton Taylor as to how the trouble began, and they told him that Tanner had bought the gun from Thornton Taylor, and that the gun went off accidentally and shot Boyd; that Tanner did not intend to shoot Boyd; that the hammer came back too far and it just went off. This evidence was admitted only as to Thornton Taylor and only for the purpose of showing the inconsistent statement of the transaction as made by Taylor as a witness, and was held incompetent for any other purpose.

Mr. Randall was recalled and testified the second time and stated that Seamon Watkins told him that he did not see any part of the

trouble; that he was watching the game of baseball and was not at the house, and did not see Tanner and Boyd engaged in a game of craps and did not see the shooting, but stated that he sold Tanner the pistol and then left the house and went out on the ball diamond.

This is the substance of all the evidence, except that it was shown that the negro, Boyd, had a bad reputation, and was regarded as a mean and dangerous character.

It will be noted that there is a considerable conflict between the witnesses for the defendant. Watkins and Randall are shown to have made grossly inconsistent statements with reference to the details of the transaction, which goes to the credibility of these two witnesses for the defendant, and the jury was well warranted in discrediting these two negroes.

It is contended for appellant on this appeal that the negro Will Latimer is unimpeached in any way, and that he was an eye witness to the transaction, and that according to his evidence Tanner first fired at Boyd, inflicting a wound in the stomach, and that Boyd followed Tanner out of the house and they were both shooting. It being further contended that the evidence of Douglas and Randall as to what the other negroes told them with reference to the affair can be considered for no purpose other than to show the inconsistent statements made by those two witnesses, and cannot be considered as evidence as to how the transaction occurred.

It is true that the evidence of Randall and Douglas with reference to the alleged conversations had with the two witnesses mentioned was only competent for the purpose of proving the inconsistent statements, and going to the credibility of the two witnesses referred to. However, there is a conflict in the evidence between Douglas, a reputable white man, and the negro Will Latimer, especially as to the length of time that Tanner was in the house where the trouble started. Mr. Douglas states that he saw Tanner drive up in an automobile and enter the house and that Tanner had been in the house but a few minutes when he heard the shot fired. Latimer states that Tanner had been in the house at least thirty minutes. The pistol transaction in which Tanner bought the pistol; the first game of craps, then the drinking of a quart of whiskey by those present; and the renewal of the crap game, if any occurred, would have taken more than a few minutes time. Douglas also testified that immediately after the shot was fired in the house, he saw Tanner run out of the house and the negro Boyd pursuing him and shooting at him, and that Tanner was running from Boyd at the time Boyd shot him down and killed him. If Douglas is to be believed there is a conflict in the evidence of Douglas and the Latimer negro. For the purposes of this case, under the rule that if there is any evidence to support the verdict, we must hold that this apparent conflict between the evidence of Douglas on the

one side and Will Latimer on the other, afforded some evidence upon which the jury could base its verdict.

As to the third assignment of error, which is with reference to the alleged insufficiency of the charge of the court on the elements of the crime, we will say that this assignment must be overruled. We are of the opinion that the charge of the court to the jury fully covered this question, and a jury could not have been left in doubt as to what was meant by the court in his statement on the subject.

We find no error in the decree of the Chancellor, and it is accordingly affirmed. Appellee will pay the cost of this appeal. The judgment here will be for the amount of the judgment below, with interest to this date.

Heiskell and Owen, JJ., concur.