CHISHOLM & MOORE MANUFACTURING CO. *v.* UNITED
STATES CANOPY CO.

(*Knoxville.*  September Term, 1903.)

1.  **CONTRACTS.** Measure of damages for breach of executory
contract of sale of personalty.

It is a general rule that the measure of damages for the breach
of an executory contract of sale of personalty is the difference
between the contract price and the market value of the goods
at the time and place of delivery.  (*Post, pp.* 209-210.)

Case cited and approved: Cole v. Zucarello, 104 Tenn., 64.

2.  **SAME.** Same. Expected profits are not allowable as damages, when.

It is a general rule that expected profits can not be allowed as
damages, where they are uncertain, speculative, and contingent, and are dependent upon numerous, uncertain, and dangerous contingencies, and are too remote, and not the direct and
immediate result of a nonfulfillment of the contract, and are
not a part of the contract, nor within the contemplation of the
parties.  (*Post, pp.* 210-211.)

Cases cited and approved: Hendrick v. Stewart, 1 Ov., 476; Porter v. Woods, 3 Humph., 56; Pettee v. Manufacturing Co., 1
Sneed, 380, 381; Whitson v. Gray, 3 Head, 442; McWhirter v.
Douglas, 1 Cold., 602, 603; Hurley v. Buchi, 10 Lea, 346; Machine Co. v. Compress Co., 105 Tenn., 212; Howard v. Manufacturing Co., 139 U. S., 199; The Anna Maria, 2 Wheat., 327;
The Amiable Nancy, 3 Wheat., 546; La Amistad de Rues, 5
Wheat., 385; Smith v. Condry, 1 How., 28; Parish v. United
States, 8 Wall., 500, 507; Bulkley v. United States, 19 Wall., 37;
Griffin v. Colner, 16 N. Y., 489; Masterson v. Brooklyn, 7 Hill.,
73; The Schooner Lively, 1 Gall., 314.

Chisholm & Moore Mfg. Co. v. U. S. Canopy Co.

3.  **SAME.** Same. Realizable profits lost by breach of contract are recoverable as damages, when.

But the profits which would have been realized by the performance of the contract, and which have been prevented by its breach, are included in the damages to be recovered in every case where such profits are not open to the objection of uncertainty or of remoteness, and where, from the expressed or implied terms of the contract itself, or the special circumstances under which it was made, it may be reasonably presumed that they were within the intent and mutual understanding of both parties at the time it was entered into. (*Post, pp.* 211-233.)

Cases cited and approved. State v. Ward & Briggs, 9 Heisk., 132, 133; Foster v. Water Co., 3 Lea, 46; Winters v. Fleece, 4 Lea, 551; Smith v. O'Donnell, 8 Lea, 479; Insurance Co. v. Heidel, 8 Lea, 495; Insurance Co. v. Mathews, 8 Lea, 504; McDonald v. Timber Co., 88 Tenn., 38, 43, 44; Reese v. Miles, 99 Tenn., 398, 401; Railroad v. Cabinet Co., 104 Tenn., 568, 574, 575; Machine Co. v. Compress Co., 105 Tenn., 187, 203, *et seq.*; Howard v. Manufacturing Co., 139 U. S., 199; United States v. Behan, 110 U. S., 338, 345-347; Telegraph Co. v. Hall, 124 U. S., 444, 454-456; Railroad v. Howard, 13 How., 307; Hadley v. Baxendale, 9 Ex., 341; Hobbs v. Railroad, L. R., 10, 2 B., 111; Griffin v. Colver, 16 N. Y., 489; Deming v. Railroad, 48 N. H., 455.

Cases cited and distinguished: Hendrick v. Stewart, 1 Ov., 476; Porter v. Woods, 3 Humph., 56; Pettee v. Manufacturing Co.. 1 Sneed, 381; Whitson v. Gray, 3 Head, 442; McWhirter v. Douglas, 1 Cold., 602, 603; Hurley v. Buchi, 10 Lea, 340; Machine Co. v. Compress Co., 105 Tenn., 212.

4.  **SAME.** Same. Same. Loss of profits for breach of contract to manufacture articles recoverable as damages; case in judgment

Where the defendant contracted with the complainant for the manufacture and delivery of brackets, for which a patent had

Chisholm & Moore Mfg. Co. v. U. S. Canopy Co.

been applied for, to be used by the defendant during the mosquito season in the manufacture of mosquito canopy frames, and it was known to the complainant that such brackets could not be bought in the open market, and that they could not be manufactured by any one else in time for the mosquito season, after his failure to manufacture and deliver them, and that defendant was taking orders for the sale of mosquito canopy frames upon the faith of complainant's proper performance of the contract; but the complainant manufactured defective brackets, and on delivery, defendant purchased a machine to remedy the defects, and used some of the brackets in this way, but refused to use and receive others, whereupon the complainant sued the defendant for the price of the brackets and other castings furnished, and defendant filed a crossbill to recover damages for complainant's breach of the contract, and proved as damages the loss of profits amounting to fifty per cent. on orders taken for canopies from solvent parties amounting to $2,225, which he was unable to fill, the profits so lost were recoverable as damages for complainant's breach of the contract, because they were not too uncertain, speculative, contingent, and remote, and were within the contemplation of the parties to the contract.

FROM KNOX.

Appeal from the Chancery Court of Knox County.— JOSEPH W. SNEED, Chancellor.

JOHN W. GREEN, for complainant.

CHARLES T. CATES, JR., for defendant.

MR. JUSTICE NEIL delivered the opinion of the Court.

The original bill in this case was filed for the purpose of collecting the purchase money for some castings alleged to have been sold by the complainant to the defendant. Thereupon the defendant filed a cross bill to recover damages for breach of the contract under which the castings were purchased. The court of chancery appeals, after deducting a certain amount, not now in controversy, for castings accepted and used by the cross complainant, found that there was a balance due to the latter under its claim of damages, and rendered a decree therefor. From this decree the original complainant has appealed and assigned errors.

The complainant is a corporation organized under the laws of Ohio, with its office in Cleveland; and the defendant is a corporation organized under the laws of Tennessee, with its office in Knoxville. Complainant is engaged in the manufacture of castings of various kinds; the defendant, in the manufacture and sale of canopies and canopy frames for mosquito nettings. Defendant ordered from complainant a large amount of malleable iron castings for mosquito canopy frames. These castings came in sets of two for each canopy, and each set consists of two pieces, which should work or fit into each other—one called the "right," and one the "left." One piece has a journal or pin which should fit into a hole or socket in the other piece. The castings which the complainant shipped to the defendant were defective, in that the journal or pin of the one piece was

too large for the hole or socket of the other piece.   De-
fendant bought a machine for that purpose, and bored
out the holes in a number of the pieces, and used them,
but finally refused to take any more of the castings, be-
cause of their defective condition.

The defendant company was organized for, and was
engaged in, the manufacture and sale of mosquito can-
opy frames, and it had bought and contracted for ma-
terials for this purpose, including the netting, frames,
wires, and brackets.   It was using in this manufacture
a peculiar device—an invention of one of its officers—
as to which a patent had been applied for, being the
bracket which is the subject-matter of this litigation,
and it was using no other bracket except this.   Under
these conditions, the defendant applied to the complain-
ant for the purpose of procuring ʻthe latter to manu-
facture for it these brackets.   The evidence and the cor-
respondence between the parties shows that it was
known to the complainant for what purpose this bracket
was to be used, and the fact that a patent had been ap-
plied for was known, and that it was a peculiar device,
owned and claimed alone by defendant, and used by it
in the sale of its mosquito canopy frames.   It was fur-
ther necessarily known how this device was to work,
and how the bracket was to be used.

The correspondence further discloses that it was made
known to the complainant that it was urgent and im-
portant that these brackets should be manufactured and
on hand by the twentieth of April, if possible, or as soon

thereafter as practicable; it being known for what purpose they were to be used. And from the character of the trade carried on by defendant, it was necessarily known that it was of the utmost importance that these goods should be gotten out and ready for sale on or before the opening of the mosquito season. The complainant undertook to manufacture these goods in the quantities ordered, with an implied warranty or agreement that the goods or brackets so manufactured should be fit for the purposes intended. It was further known to the complainant that the process of manufacturing these brackets took some time; the complainant's officer, Mr. Moore, testifying that it took some thirty days to complete the manufacture of a quantity of them. A considerable time was consumed in the process of annealing them. The parties therefore had in contemplation the further fact that, if the complainant did not manufacture and deliver these goods according to contract, the defendant could not, after this failure, buy brackets of this peculiar make in the open market, and further that the defendant could not make an additional arrangement or contract with other parties, who might comply with the contract, and save the business for that year. These facts and conditions were necessarily before the parties, and in their contemplation, when the contract was made and when it was breached.

With these conditions existing, the complainant violated the contract in the manner above stated. That is, a large part of the goods actually delivered and received

turned out to be of such character that they could not be used without being treated in the manner above mentioned; and, in so treating them and cutting down the journals, many of them were broken. For these and other reasons, a large part—at least more than one-half —of the amount actually received by the defendant proved to be practically worthless for the purpose for which they were manufactured and sold.

The court of chancery appeals further finds that defendant had soliciting agents and salesmen in the field, and had sold or taken orders for a considerable number of the mosquito canopy frames above referred to. Their orders so taken and received by them from good and solvent parties amounted to from $2,200 to $2,500.

It is further found that the profits the company would have received from this amount of sales, which they had to cancel because of complainant's default, would have been about 50 per cent. of the gross amount, or from $1,100 to $1,250.

Speaking further of these damages, the court of chancery appeals say:

"We think there can be no escape from the conclusion that these damages were actually suffered by the defendant. They are not only capable of satisfactory proof, but they have been proven, and we think they were within the reasonable contemplation of the parties when the contract was made. The complainant knew the defendant was dealing in these mosquito canopy frames; that defendant was using this bracket as a

Chisholm & Moore Mfg. Co. v. U. S. Canopy Co.

necessary part in the manufacture of the frames. They necessarily knew that defendant was taking orders. They necessarily knew that they could not comply with these orders unless they could use these brackets. They necessarily knew that the brackets could not be bought in the open market. They necessarily knew that, if the complainant did not comply with this contract, the defendant would lose the business of that season. They necessarily knew that it would lose whatever profit it would have made upon the orders that it should take and be unable to fill, if the complainant did not comply with its contract. The officers of complainant did not know what amount of orders had been or would be taken, but they necessarily must have known, and reasonably had in contemplation, that they would suffer loss of whatever the profits amounted to upon such orders as might be taken, if they were unable to fill the orders by reason of complainant's default. . . . They necessarily had in contemplation the character of loss that would follow a breach."

The error assigned is, in substance, that it was improper for the court of chancery appeals to allow the expected profits as damages, for the reason that this amounted to an allowance of speculative damages.

It is true, in general, that the measure of damages for breach of an executory contract of sale of personalty is the difference between the contract price and the market value of the goods at the time and place of delivery.

111 Tenn—14

*Cole* v. *Zucarello,* 104 Tenn., 64, 56 S. W., 850. It is also true that, in general, profits cannot be allowed as damages, for the reason that they are usually uncertain; depending, as they do, upon the dangers and hazards of business. But it cannot be said that there are no exceptions to the rule.

The reasons underlying the general rule, and also a succinct statement of the grounds of the exceptions recognized to the rule, may be found in the following excerpt from *Howard* v. *Stillwell & B. Mfg. Co.,* 139 U. S., 199, 11 Sup. Ct., 500, 35 L. Ed., 147, which we adopt as a sound statement of the law, viz.:

"The grounds upon which the general rule of excluding profits in estimating damages rests are (1) that in the greater number of cases such expected profits are too dependent upon numerous uncertain and dangerous contingencies to constitute a definite and trustworthy measure of actual damages; (2) because such loss of profits is ordinarily remote, and not, as a matter of course, the direct and immediate result of a nonfulfillment of the contract; (3) and because most frequently an engagement to pay such loss of profits in case of default in the performance is not a part of the contract itself, nor can it be implied from its nature and terms. 1 Sedg. Damages (7 Ed.), 108; *The Lively,* 1 Gall., 315, 325, Fed. Cas. No. 8,403 per Mr. Justice Story; *The Anna Maria,* 2 Wheat., 327, 4 L. Ed., 252; *The Amiable Nancy,* 3 Wheat., 546, 4 L. Ed., 456; *La Amistad de Rues,* 5 Wheat., 385, 5 L. Ed., 118; *Smith* v. *Condry,* 1 How.,

28, 11 L. Ed., 35; *Parish* v. *United States,* 8 Wall., 500, 507, 19 L. Ed., 472; *Bulkley* v. *United States,* 19 Wall., 37, 22 L. Ed., 62.   But it is equally well settled that the profits which would have been realized, had the contract been performed, and which have been prevented by its breach, are included in the damages to be recovered in every case where such profits are not open to the objection of uncertainty or of remoteness, and where, from the expressed or implied terms of the contract itself, or the special circumstances under which it was made, it may be reasonably presumed that they were within the intent and mutual understanding of both parties at the time it was entered into.   *U. S.* v. *Behan,* 110 U. S., 338, 345-347, 4 Sup. Ct., 81, 28 L. Ed., 168; *W. U. Tel. Co.* v. *Hall,* 124 U. S., 444, 454, 456, 8 Sup. Ct., 577, 31 L. Ed., 479; *Phila., W. & B. R. Co.* v. *Howard,* 13 How., 307, 14 L. Ed., 157."

Other illustrative authorities are as follows:

In section 144 (8 Ed.), Sedg. on Damages, the case of *Hadley* v. *Baxendale,* 9 Ex., 341, is discussed and considered at length, and in a note to this section it is said:

"So entirely is the later law founded on this case, that the great body of cases since decided, involving the measure of damages for breach of contract, resolve themselves into a continuous commentary upon it.

"Plaintiffs were the owners of a steam mill.   The shaft was broken, and they gave it to the defendant, a carrier, to take to the engineer to serve as a model for a new one.   On making the contract, the defendant's

clerk was informed that the mill was stopped, and that the shaft must be sent immediately. He delayed its delivery, the shaft was kept back in consequence, and, in an action for breach of contract, they claimed as specific damages the loss of profits while the mill was kept idle. It was held that, if the carrier had been made aware that a loss of profits would result from delay on his part, he would have been answerable, but, as it did not appear that he knew that the want of the shaft was the only thing which was keeping the mill idle, he could not be made responsible to such extent. The court said: 'We think the proper rule in such cases as the present is this: Where two parties have made a contract, which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally (that is, according to the usual course of things) from such a breach of contract itself, or such as may be reasonably supposed to have been in the contemplation of both parties at the time they made the contract as a probable result of the breach of it. Now, if the special circumstances under which the contract was actually made were communicated by the plaintiff to the defendant, and thus known to both parties, the damages resulting from the breach of such a contract which they would reasonably contemplate would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated. But

on the other hand, if these special circumstances were wholly unknown to the party breaking the contract, he, at the most, could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases, not affected by any special circumstances, from such breach of contract.    For, had the special circumstances been known, the parties might have specially provided for a breach of contract by special terms as to the damages in that case, and of this advantage it would be very unjust to deprive them.    The above principles are those by which we think the jury ought to be guided in estimating the damages arising out of any breach of contract.' "

In section 146, Sedgwick states:    "The rule in *Hadley* v. *Baxendale* would seem to mean that plaintiff may recover such damages as normally result from the breach of contract, or he may show certain special facts to have been known to the defendant at the time of the contract, which would give notice to him that a breach of the contract would result in an otherwise unexpected loss, and in such case the plaintiff might recover his special loss."

In the case of *Hobbs* v. *London & S. W. Ry. Co.,* L. R., 10, Q. B., 111, Blackburn, J., citing the rule in *Hadley* v. *Baxendale*, Says:

"We think the proper rule in such a case as the present is this:    Where two parties have made a contract, which one of them has broken, the damages which the

other party ought to receive in respect of such breach of contract should be such as may be fairly and reasonably considered either arising naturally (that is, according to the natural course of things) from such breach of contract itself (that is one alternative), or such as may be reasonably supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach of it."

Again, in section 174, the same author says:

"The allowance of profits, when not excluded as unnatural or remote, is wholly a question of the certainty of proof. Whenever there is an interference with or withholding of property, or breach of contract, or commission of a tort, the gains prevented, if proven, may be recovered. As a general rule the expected profits of a business cannot be proved, and therefore cannot be recovered. They might have been made, and they might not. . . . Instead of profits, there might have been losses. Hence in such cases the measure of damages is not the expected profits, but the average value of the use of the property, land, or business; and, to ascertain this, evidence of actual past profits must be admissible. This bears a close analogy to the ordinary rule with regard to money. Expected profits from the use of money can never be recovered. The measure of damages is the average value of the use, or, in other words, the interest. Going a step further, we shall find that, whenever expected profits become capable of certain proof, then they can be recovered."

In section 176 the same author says:

"Profits are recoverable if proximate, natural, and certain. The plaintiff may then, in all proper cases, show a gain prevented, as a ground of compensation."

And again: "In the leading case on the subject, Selden, J., in *Griffin* v. *Colver*, 16 N. Y., 489, 69 Am. Dec., 718, said:

" 'It is not a primary rule, but it is a mere deduction from that more general and fundamental rule which requires that the damages claimed should in all cases be shown by clear and satisfactory evidence to have been actually sustained. Profits that would certainly have been realized but for defendant's default are recoverable. Those which are speculative and contingent are not.' "

And again, further on, quoting from the same opinion, the author says:

"The broad, general rule in such cases is that the party injured is entitled to recover all his damages, including gains prevented as well as loss sustained. And this rule is subject to but two conditions: The damages must be such as may fairly be supposed to have entered into the contemplation of the parties when they made the contract (that is, must be such as might naturally be expected to follow its violation), and they must be certain both in their nature and the cause from which they proceed."

In section 177, Sedgwick says:

"The general rule is, then, that a complainant may

recover compensation for any gain which he can make it appear with reasonable certainty the defendant's wrongful act prevented him from acquiring, subject, of course, to the general principles as to remoteness, compensation, etc., already stated. His compensation will be measured by the most liberal scale which he can show to be a proper one. Damages for the interruption of the business of a manufacturer, for instance, may be measured either by the rental value of the property kept unproductive or by the profits of the manufacture, if the plaintiff can show that they would have been greater than the rental value. The questions that arise in the cases are therefore questions of sufficiency of proof, and it is to be expected that the courts will not in all cases agree in their interpretation of the facts. But the decisions show, under the circumstances, a surprising degree of harmony."

The rule in *Hadley* v. *Baxendale* has been approved in this State in *McDonald* v. *Unaka Timber Co.,* 88 Tenn., 38, 43, 44, 12 S. W., 420; *Reese* v. *Miles,* 99 Tenn., 398, 401, 41 S. W., 1065; *Railroad* v. *Cabinet Co.,* 104 Tenn., 568, 574, 575, 58 S. W., 303, 50 L. R. A., 729; and in *Machine Co.* v. *Compress Co.,* 105 Tenn., 187, 203, *et seq.,* 58 S. W., 270.

There are several cases in this State which hold that profits cannot be allowed as damages, on the ground that they are speculative and uncertain. *Hendrick* v. *Stewart,* 1 Overt., 476; *Pettee* v. *Tenn. Mfg. Co.,* 1 Sneed, 380; *Whitson* v. *Gray,* 3 Head, 442; *Hurley* v. *Buchi,* 10

Lea, 346; *McWhirter* v. *Douglas*, 1 Cold., 602, 603; *Machine Co.* v. *Compress Co.,* 105 Tenn., 212, 58 S. W., 270.

In the last-mentioned case it appeared that a cotton compress had been injured by defective machinery furnished. The measure of damages was fixed at the rental value of the property during the ensuing cotton season. The court held that the machinery was furnished with a view that it was to be used in that season. It was said that the expected profits to be gained by the running of the mill could not be allowed as damages.

In *Railroad* v. *Cabinet Co.,* supra, it appeared that certain pews had been manufactured by the cabinet company for a church in Virginia, and they were to be delivered by a certain date, under a penalty for each day's delay thereafter. The railway company received the goods, having knowledge of the penalty contract referred to. The court held, applying the principles of *Hadley* v. *Baxendale,* that the cabinet company should recover of the railroad company the penalty which it had incurred to its vendee. The court said: "The contract and breach by the defendant now before the court was undoubtedly a special one. The pews in question were manufactured after a peculiar design for a particular church, under a particular contract, of which the defendant was particularly informed at the time it accepted them for carriage. The contract and carriage being special, the penalty for its nondelivery was likewise special, and the plaintiff was entitled to recover

all damages resulting from the breach, whatever the amount may have been."

In the same case it is said: "If the property is sold at an advantageous price before shipment on condition that it be delivered within a certain time, and the carrier, with knowledge of that fact, undertakes the transportation, and, through negligence, fails to make the delivery in time, and the conditional purchaser fails to receive the property on account of the delay, the liability of the carrier is measured by the difference between the market value of the property when it arrived at the place of destination and the price at which it was conditionally sold before shipment." *Deming* v. *Grand Trunk Railway Co.,* 48 N. H., 455, 2 Am. Rep., 267; Hutchinson on Carriers, section 772.

In the same case the following is quoted with approval from 3 Wood's Railway Law, 1607: "If the intended use and application of the goods to be carried was expressly brought to the notice of the company's servants at the time they received them, or could be reasonably inferred from the circumstances known to them, so that the special use or application might be fairly considered to be within the contemplation of both parties to the contract, the consignor is entitled to recover the damages naturally resulting from his so being unable to use or apply the goods, since both parties may be said to have made this the basis of the contract."

In *Reese* v. *Miles,* 99 Tenn., 398, 41 S. W., 1065, it appeared that eggs were sold as fresh eggs, with a knowl-

edge that they were to be resold on the Washington market. They were resold, in fact, upon the Boston market, which was at the time the same as the Washington market. The eggs not being fresh, they were sold at very much below the market price in Boston. The measure of damages was held to be the difference between the sum so realized and the market price at Boston. In this case the following from Benjamin on Sales is quoted with approval: "The vendee who takes a warranty with notice that he buys to sell again in another market may include in his damages both the losses actually sustained by the breach, and also the profits he would have made upon the resale, had the article been what it was warranted to be." *Reese* v. *Miles,* 99 Tenn., 398.

We have referred supra to the cases of *Hendrick* v. *Stewart,* 1 Overt., 476; *Porter* v. *Woods,* 3 Humph., 56, 39 Am. Dec., 153; *Pettee* v. *Tenn. Mfg. Co.,* 1 Sneed, 381; *Whitson* v. *Gray,* 3 Head, 442; *McWhirter* v. *Douglas,* 1 Cold., 602, 603; *Hurley* v. *Buchi,* 10 Lea, 346; and *Machine Co.* v. *Compress Co.,* 105 Tenn., 212, 58 S. W., 270 —as holding that profits cannot be allowed as damages, on the ground that they are speculative and uncertain.

But it is to be observed that in none of those cases did the court have before it directly the exact question presented for consideration in the present case.

In the cases referred to, the general principle that profits cannot be allowed as damages, because too uncertain and speculative, was enunciated in respect of the following facts, viz.:

In *Hendrick* v. *Stewart,* wherein it appeared that a steamboat had been lost by a sudden rise of the river while in charge of the defendant for the purpose of making repairs, which repairs had been negligently delayed .by the defendant, damages were claimed for the loss of the voyage which was to be made upon the completion of the repairs. The court said: "Evidence, of the probable advantage that might have been derived from the voyage cannot be received. . . . The plaintiff is not entitled to damages for any fancied or probable advantage he might have derived from his contract. The defendants contracted to repair the boat. The plaintiff is entitled to damages to the amount of those repairs, and no more."

In *Porter* v. *Woods* it appeared that the defendant was sued for the value of certain castings to be used in the manufacture of plows, which castings had proven defective. He sought to recoup "for delay in business, for injury to his reputation, for speculative profits." The court held that damages of this character could not be allowed.

In *Pettee* v. *Tenn. Mfg. Co.,* it appeared that the plaintiff had delivered to the defendant machinery for a cotton mill, but that the delivery had been delayed beyond the time fixed in the contract. The plaintiff sued for the value of the machinery, and the defendant sought to recoup damages for the delay, by reason of injury alleged to have been inflicted upon his business by the delay. Speaking to this point the court said:

"There was proof tending to show that, if the machinery had been delivered agreeably to the special contract, the mill would have commenced operations in the spring of 1848, and that the profits of the mill might probably have been to a large amount, and that the capital stock was called in from the stockholders, upon the faith of the compliance with the contract by the plaintiff, much sooner than it otherwise would have been, and that large sums were lost in the interest on the capital invested." Speaking to this testimony, the court said:   "When we look to the cases and elementary writers, we find the general rule laid down that the damage to be recovered must always be the natural and proximate consequence of the act complained of.   2 Greenl. Ev., 210.

"Damages for breaches of contract are only those which are incidental to, or directly caused by, the breach, and may be reasonably supposed to have entered into the contemplation of the parties, and not speculative profits or accidental or consequential losses.   2 Kent, Comm. 480, note.   Although this is a general rule, in its application to particular cases there is the most serious and distressing difficulty, and the legal and natural consequence, or the natural and proximate consequence, cannot easily be discovered.   It must be left for the application to causes as they may arise by sound and discriminating minds.   There are, however, some cases which show that an allowance of damages upon the basis of a calculation of profits would be inadmissible.   Such profits are too speculative and uncertain to

make them the measure of damages. In the case of *Masterson v. The Mayor of Brooklyn,* 7 Hill, 73, 42 Am. Dec., 38, Chief Justice Nelson says: 'It is a very easy matter to figure out large profits upon paper, but it will be found that these, in a great majority of cases, become seriously reduced when subjected to the contingencies and hazards incidental to actual performance.' There is a great difference between the actual test of exper- ience and speculative estimates of profits. Judge Story, in the case of *The Schooner Lively,* 1 Gall., 314, Fed. Cas. No. 8,403, says: 'An allowance of damages upon the basis of a caluculation of profits is inadmissible. The rule would be in the highest degree unfavorable to the interests of the community. The subject would be involved in utter uncertainty. It would be a calcula- tion upon conjectures, and not upon facts.' . . . If speculative profits or loss of interest upon capital are to be taken into view in the assessment of damages, they should be expressly stipulated for in the contract itself. The rule would otherwise be too vague and indefinite, and would have no reference to the particular thing which is the object of the contract, and unlimited dis- cretion would be left to the jury."

In *Whitson v. Gray* it appeared there was a misrepre- sentation of four and one-half years as to the age of a slave woman, the subject of the contract, and it was sought to prove as an element of damages "that the woman in four and a half years might have given birth

to several children." The court held that this was too remote.

In *McWhirter* v. *Douglas,* there was a contract whereby Douglas agreed to pay McWhirter for the three years next ensuing November 27, 1852, the difference between "what the business of H. & B. Douglas promises" for the three years stated and the sum which might be realized by McWhirter during this time under an offer made to him by Cossitt, Howard & Hill, "which," said the contract, "we now presume to be from one thousand dollars to three thousand dollars." The contract provided that the sum so to be paid should be paid to him "so soon as the correct amount can be arrived at." Under the offer which Cossitt, Howard & Hill had made to McWhirter, the latter was to be taken into partnership after six months' probation, if at the end of that time they should be mutually pleased, and was to receive 20 per cent. of the profits. McWhirter remained with Douglas & Co. for the three years they had agreed upon. After this, assuming that he had not realized from the business of this firm as much as he would have made if he had accepted the proposal made to him by Cossitt, Howard & Hill, McWhirter brought suit against Douglas upon the paper of November 27, 1852.

On the trial, Cossitt proved that the offer was made to McWhirter in good faith. The witness objected to stating what the profits had been of his firm during the three years in question, and the objection was sustained by the trial judge. Thereupon he was asked this ques-

tion: "How much ought your business to have made?" This was objected to by Douglas, but the court permitted the witness to answer; and he said his house, or, rather, a house with the capital of his, ought to have made $35,000 or $40,000 a year, and that his house met with no reverses in the years 1852, 1853, 1854, and 1855. And this answer was allowed to go to the jury as evidence of the measure of plaintiff's damages, the defendant excepting to the evidence. There was also evidence tending to show that the business of Douglas & Co. would probably realize during the three years in question $20,000 per year for the junior partners, of which sum, if realized, McWhirter would be entitled to one-third. The testimony did not make the amount of the profit of the respective firms more definite than this. The court, in substance, charged the jury that, if they found the contract was made and carried into effect, the plaintiff was entitled to recover from the defendants the difference between what he received from the firm of H. & B. Douglas & Co. (which the testimony showed was in fact only $15,776.04) and what he would have received from the firm of Cossitt, Howard & Hill, and that they should ascertain this from the proof, looking to the actual net profits of such houses. The court, among other things, said: "The legal effect of the contract being that the defendant was to make the situation of the plaintiff in this Douglas house as profitable as it would have been in the house of Cossitt, Hill & Co." The jury returned a verdict of $4,262.84 in favor of McWhirter,

Chisholm & Moore Mfg. Co. v. U. S. Canopy Co.

and Douglas & Co. moved for a new trial; and this being overruled, and judgment rendered against them, they appealed.

The court, speaking through Wright, J., said: "We do not agree with the circuit judge in his construction of this contract. . . . Douglas might have said to McWhirter: 'When the business of the two firms is over, and the actual profits of each known, if what you get from my business is not equal to twenty per cent. of the profits of the other house, I will make it so.' But the language of this writing is very different, and, in our opinion, conveys no such idea. What, then, was meant? Douglas said to McWhirter: 'You have before you two offers—one in my house, and one in the Memphis house. The business of my house bids fair, judging from the past, and this additional capital to go on, to make so much; and that of the Memphis house, judging by what Cossitt says, to make so much. You think the offer of the Memphis house is the better one of the two. So do I. We have compared the two offers, and computed their values, and we now suppose the offer of the Memphis house to be more valuable, by from one to three thousand dollars. If you will give up the Memphis offer and become a partner in my house, I will pay you the difference in the value of the two offers, so soon as the actual sum can be arrived at. We have now in our minds some data or rule by which this is to be reached, and to which, as soon as we can, we will resort to settle it.'

This we take to be the legal effect of the writing. They did not intend to wait or look to the actual result of the business of these two firms, nor are we permitted to do so. . . . But as a mode of arriving at the exact damages or sum due, the contract contemplates that the other data or proof, besides that furnished by the instrument itself, were to be resorted to; but what that was to be is not shown in the writing or elsewhere in the record. This being so, if we attempt to enlarge the damages beyond the sum already stated [nominal damages, or, in the alternative, the mean sum between one dollar and three thousand dollars] as reasonably to be inferred from the writing itself, we are at once in the field of speculation and conjecture. . . . In the case in Sneed [*Petee* v. *Tenn. Mfg. Co.*] the court says: 'If speculative profits or losses of interest upon capital are to be taken into view in the assessment of damages, they should be expressly stipulated for in the contract itself. The rule would otherwise be too vague and indefinite, and would have no reference to the particular thing which is the object of the contract, and unlimited discretion would be left to the jury.' The same general doctrine is to be found in *Masterson* v. *Mayor, etc., of Brooklyn,* 7 Hill, 61, 42 Am. Dec. 38. And if the assessment of remote or speculative damages is to be claimed to be taken out of the general rule by reason of an express stipulation to this effect, we understand from the authorities that all uncertainty, both as to the object of the contract and the amount of damages, must be re-

Chisholm & Moore Mfg. Co. v. U. S. Canopy Co.

moved by the contract itself.    Otherwise the stipulation, however vague, will but serve to destroy the rule.    They cannot be considered unless capable of computation with reasonable certainty and precision.

"Remote and contingent damages, depending on the result of successive schemes or investments, are never allowed for the violation of any contract.    Such a rule would be in the highest degree unfavorable to the interests of the community.    The subject would be involved in utter uncertainty. . . . Another reason why speculative estimates of profits will not be allowed is that it is not proper to admit witnesses to testify their opinion as to the amount of damages which the plaintiff has sustained in their loss or deprivation.  They can only testify as to facts (Sedg. on Dam. 589, 591), and to permit a witness to testify as to what a mercantile house ought to have made upon a given capital, in order to reach anticipated profits, is even more objectionable. Here McWhirter, in the offer of Cossitt & Hill, was to share only in the profits.    He was to take none of the capital.    It was uncertain whether they would all agree, upon the six-months probation, to form the partnership ; and then it was dissolvable by death, or by the action of either of the parties in thirty days' time, and the good fortune of the house in its successive schemes of investment, sale, and reinvestment were all to risk.    How, then, could the value of the offer to McWhirter, unless fixed by him and Douglas, be anything but conjectural?"

In *Hurley* v. *Buchi* it appeared that plaintiff, a market

gardener, applied to defendant to buy Early Rose pota-
toes, and bought of them ten barrels which were reported
as the Early Rose.   The defendants were informed that
the purchaser wished this kind to plant for the early
market.   It was agreed that the Early Rose would ma-
ture about the middle of June, and that the kind actu-
ally delivered, although planted in due time and well
cultivated, did not mature until in August;   that the
Early Rose, when they matured, were worth $3.50 to $4
per barrel, and the other at their maturity were worth
$1 per barrel.   Upon the foregoing facts, the circuit
court allowed the plaintiff for six barrels, as the proba-
ble product of each barrel (that is to say, for sixty bar-
rels of Early Rose at $3.50 per barrel), and deducted
therefrom the 60 barrels of late potatoes actually raised,
at the price of $1 per barrel, and gave a judgment in
favor of the plaintiff for $150.   "In arriving at this
conclusion," said the court, speaking through Deaderick,
C. J., "his honor assumes that, if the Early Rose had
been delivered, they would have been planted, cultivated,
and have matured at a given time, to wit, the middle of
June, and were then worth $3.50 per barrel, whereas the
variety actually planted yielded six barrels for each bar-
rel planted, and were worth when they matured, in Au-
gust, but $1 per barrel."   The court held that the dam-
ages so reached were merely speculative, and could not
be allowed.

In *Machine Co.* v. *Compress Co.* there was no effort to
prove any certain profits.   Indeed, from the facts pre-

sented in this case, it is manifest that the profits suggested could have been nothing more than speculative, since, if allowed, they could have been based only upon an estimate of how much custom or patronage the compress company would have secured if it had been able to run the season through.

From this review of our cases, it is clear that the court did not in either of them have before it a state of facts in any wise resembling the facts shown in the present case, but, on the contrary, facts from which there could be no other conclusion than that the damages sought were purely speculative and contingent.

We do not in anywise impair the force of the general rule that profits fall within the designation of speculative damages, and cannot be allowed; but we think there is a clear distinction where the testimony shows that the damages, although consisting of profits, are really certain and clear. In the present case it appears that orders had been taken from solvent people for goods amounting to at least $2,200, and that the profit upon these sales was 50 per cent. Here is no element whatever of speculation or uncertainty. To deny compensation under these circumstances would be to apply the general rule to a case to which it was never intended to be applied, and work a practical injustice.

We think the facts stated show that the contract was made with a knowledge on the part of the complainant that the articles which they were to furnish were to be used in the manufacture of mosquito canopy nets, and

that these articles could not be supplied by any one else, and that the canopy nets could not be made unless the articles were supplied, and that these canopy nets were to be manufactured for sale on the market. We are of the opinion, therefore, that the damages which were incurred were fairly within the contemplation of the parties.

In *State of Tennessee* v. *Ward & Briggs,* 9 Heisk., 132, 133, and other cases (*Foster* v. *Water Co.,* 3 Lea, 46; *Winters* v. *Fleece,* 4 Lea, 551; *Smith* v. *O'Donnell,* 8 Lea, 479; *Insurance Co.* v. *Heidel,* Id., 495; *Insurance Co.* v. *Mathews,* Id., 504), it is stated, in substance, that "the contract itself must give the measure of damages, and, if it fail to do so, the damages can only be nominal." This is merely a brief statement of the rule in *Hadley* v. *Baxendale*—that "where two parties have made a contract, which one of them has broken, the damages which the other party ought to receive in respect of such breach should be either such as may fairly and reasonably be considered as arising naturally (i. e., according to the usual course of things) from such a breach of contract itself, or such as may reasonably be supposed to have been within the contemplation of both parties at the time they made the contract as the probable result of the breach of it." The contract thus gives the measure of damages upon the first branch of the rule by the mere statement of its terms, its subject-matter, and the obligations of the parties. As to the second branch, it gives the measure when, in the course of the dealing between

the parties in the making of the contract, there are brought to the attention of the person who assumes the obligation of its performance, or he knows, certain facts or circumstances from which it may reasonably be inferred that special damages will probably ensue upon failure of performance.    "It is a rule of interpretation," says Sutherland, "that the intention of the parties is to be ascertained from the whole contract, and considered in connection with the surrounding circumstances known to both parties.  If it appear by these surrounding circumstances that the contract was entered into and known by both parties to be entered into to enable one of them to serve or accomplish a particular purpose, whether to secure a special gain or to avoid an anticipated loss, the liability of the other for a violation of the contract will be determined, and the amount of damages fixed with reference to the effect of the breach in hindering or destroying that object.  The proof of such circumstances makes it manifest that such damages were within the contemplation of the parties.  Looking alone at the contract,   .   .   .    silent as to such circumstances,   .   .   .    such damages sometimes appear to arise very remotely and collaterally to the undertaking violated.  But when the contract is considered in connection with the extrinsic facts, there is established a natural and proximate relation of cause and effect between the breach of the contract and the injury to be compensated."    Sutherland on Damages, p. 29.

This phase of the matter is illustrated in *Machine Co.*

v. *Compress Co.*    The special damages there allowed were based upon the fact that the parties had in contemplation that the repairs which were to be made upon the compress were for the purpose of enabling it to operate during the ensuing cotton season.    The fact that this purpose was within the contemplation of the parties was shown by the testimony of Mr. Cutrer, president of the compress company, who testified as follows:

"Mr. Leach thoroughly understood, and we discussed together, the necessity for having this contract done in time to press cotton for the season of 1897, and that, if his company took the contract, they were to take it and complete the work in time for the crop of 1897."

And the following testimony of Mr. W. S. Campbell:

"What information, if any, did you impart to the Livermore Foundry & Machine Company of the necessity of having the work contracted for completed in time, and as to the uses to which the press, when repaired, was to be put?"

"Well, I, of course, impressed the fact upon him that we wanted it completed in time to press cotton that would begin to come in to us; and, in fact, they fully understood the nature of the contract, and the necessity for having it in shape by the time the season was open for compressing."

It is insisted by the complainant that these damages should not be allowed because the castings were not themselves to be resold, but were only to enter into the manufacture of another article of commerce, which was

Chisholm & Moore Mfg. Co. v. U. S. Canopy Co.

to be the subject of sale. We do not think this makes any practical difference. It is clear, under the facts stated, that the failure to furnish the castings was the proximate cause of the injury suffered by the defendant; that this injury was within the contemplation of the parties, and hence must be held to be a matter for which the complainant should account.

It results, there was no error in the decree of the court of chancery appeals, and it must be affirmed.

WILKES, J., dissents.