[No. 9306. Department One. March 10, 1911.]

## SEDRO VENEER COMPANY, *Appellant* v. F. J. KWAPIL, *Respondent.*[1]

SALES—BREACH OF CONTRACT — DAMAGES. Where the seller breached a contract to furnish twenty-five car loads of egg case shooks for resale to eastern customers of the buyer, a jobber, who subsequently *bona fide* resold all of the same at a profit and was unable to fill the orders, the measure of damages is the net profit the buyer would have made, and not the difference between the contract and the market price; since the prospective profits were reasonably within the contemplation of the parties, although he had made no resales when the contract was made.

SAME—MITIGATION OF DAMAGES—BURDEN OF PROOF. In an action for damages for breach of a contract to furnish egg case shooks to a jobber for resale, the burden is upon the defendant to show that the buyer could have purchased the shooks elsewhere.

[1]Reported in 113 Pac. 1100.

SAME—DAMAGES—PROSPECTIVE PROFITS—EVIDENCE—SUFFICIENCY. The evidence shows with sufficient certainty loss of prospective profits on contemplated resales of twenty-five car loads of egg case shooks, where it appears that he made *bona fide* resales thereof to his customers at a net profit of $100 per car.

FRAUDS, STATUTE OF—SALE OF GOODS—DELIVERY OF PART—PART PAYMENT. An oral modification of a written contract of sale of goods is not void under the statute of frauds, where, within the exception of Rem. & Bal. Code, § 5290, the purchaser "received and accepted part of the goods" and paid for the same.

SALES—BREACH—DEFENSES—NONPAYMENT. The seller of goods cannot avoid liability for breach of a contract by reason of the purchaser's failure to pay a balance due on goods delivered, where that was not assigned as a reason for failure to perform until after the damage to the buyer had already accrued.

SAME—ESTOPPEL. Breach of a seller's contract to fill orders of the buyer for a certain quantity of goods is not excused by the buyer's failure to file the orders within the time contemplated by the contract, where the seller was then behind in filling the orders already filed, and thereafter the parties proceeded with the contract.

Appeal from a judgment of the superior court for King county, Tallman, J., entered November 16, 1910, upon the verdict of a jury rendered in favor of the defendant, in an action on contract. Affirmed.

*Million & Houser* and *George Friend*, for appellant.

*John E. Ryan* and *Grover E. Desmond*, for respondent.

PARKER, J.—The plaintiff commenced this action to recover from the defendant a balance of $517 upon the purchase price of two car loads of egg case shooks. The defendant did not deny the sale or the amount of the balance alleged to be due thereon; but alleged, as an affirmative defense and counterclaim, a failure on the part of the plaintiff to furnish twenty car loads of shooks in accordance with a contract between the parties, and that by reason of such failure, the defendant was damaged by loss of profits thereon in the sum of $2,000, for which sum, less the $517, he demanded judgment against the plaintiff. A trial before the

court and a jury resulted in a verdict and judgment in de-
fendant's favor for $1,000.  The plaintiff has appealed.

The appellant is a manufacturer of box shooks and other
wood products, in Skagit county.  Respondent is engaged
in· selling box shooks as a jobber, to the trade in the middle
western states.  His place of business is at Seattle.  On
October 9, 1908, a contract was entered into between the
parties by which appellant was to manufacture and furnish
to respondent twenty-five car loads of egg case shooks to sup-
ply his trade in the middle western states.  This contract is in
writing, and so far as necessary for us to notice its provis-
ions, they are as follows:

### "BUYERS AND SELLERS CONTRACT.

"This contract, made and entered into this 9th day of
October, 1908, by and between the Sedro Veneer Company,
a corporation doing business at Sedro, Washington, herein-
after to be known as the 'Seller,' and F. J. Kwapil & Com-
pany, of Seattle, Washington, hereinafter to be known as the
'Buyer.'

"Witnesseth: as follows to wit:  For and in consideration
of the conditions and agreements hereinafter named, the
'seller' agrees to ship to the order of the 'buyer' (25) twenty-
five car-loads of egg case shooks to be manufactured from
cottonwood, as per the following specifications, all lumber
to be thoroughly dry and free from rot:

. "Car loads as follows: 2 sawed ends 7-16″ x 11¾″ x 12½
SIS 1 piece or 2 piece cleat.

"1 sawed ctr. 7-16″ x 12½″ x 11¾″ rgh 1 or 2 piece.

"4 sawed cleats 7-16″ x 1-3″ x 11¾″ SIS 1 piece.

"2 veneered sides 3-16″ x 12½-8 x 25″ 1 piece.

"1 veneered top 3-16″ x 11¾″ x 26″ 1 piece.

"1 veneered bottom 3-16″ x 11¾″ x 25″ 1 or 2 piece.  . .

"All shipments are to be made by rail, and are to be loaded
on cars by and at a shipping station of the 'seller' subject
to the orders filed by the 'buyer.'  The 'buyer' to have enough
orders filed on or before January 20th 1909 for at least one-
half of this contract.  Shipments to extend from date above
mentioned until July 1, 1909.

"The 'buyer' agrees to pay the 'seller' ($8) eight dollars
per hundred for all cases ordered and shipped, manufactured

with the spruce ends, centers and cleats, said number of cars of this class of stock not to exceed 50 per cent of this contract: And ($8.60) eight and 60-100 dollars per hundred cases manufactured with cottonwood ends, centers and cleats. Said prices to be net cash f. o. b. 'seller's' mill, to be paid either by 'buyer's' checks or sight draft drawn by 'seller' on 'buyer' at Seattle. All freight charges to be paid by the 'buyer.'

"If the 'seller' turns out more than the above number of cars, 'buyer' is to have the first option on same.

"Conditions of this contract are such that the 'seller' shall not be held responsible for delivery of said egg cases if prevented by log shortage, strikes, car shortage, the elements or other unavoidable causes beyond the 'seller's' control."

Soon thereafter appellant furnished to respondent samples of the shooks, to be exhibited to his customers. He then proceeded to the middle western states and visted his customers, and succeeded in entering into contracts of sale with them for egg case shooks sufficient to consume the entire amount contracted for with appellant, within the time fixed by the contract for furnishing them by appellant. Only five car loads of the shooks were ever furnished by the appellant, the two car loads sued upon being among those so furnished, though appellant was repeatedly urged by respondent to furnish others. Because of appellant's failure to furnish others when requested so to do, from time to time, respondent's customers cancelled their orders and he lost his profits upon the orders so cancelled. Respondent's net profits upon his sales to his customers would have been approximately $100 per car had appellant furnished the shooks as contracted for so that his sales could have been consummated. While respondent did not have any sales with his customers contracted for at the time of making the contract with appellant, we think the evidence renders it certain that appellant did then know that respondent was contracting for the shooks to sell them to his customers in the middle western states, at a profit, during the time covered by the contract.

There seems to be no dispute upon this question, and the trial court, in giving its instructions upon the measure of damages, assumed this to be true, as we think it was warranted in doing.

It is contended by learned counsel for appellant that the court erred in its instructions to the jury upon the measure of damages. The substance of these instructions was, that if the jury should find that the respondent had made *bona fide* sales of the shooks to his customers, and he was prevented from completing such sales by the failure of appellant to furnish the shooks according to the contract, then the measure of respondent's damages would be the difference between the price he was to pay appellant and the price at which he contracted to resell the shooks to his customers, less the expense incident to the delivering of them to his customers. In other words, that his measure of damages would be the net profits he would have made upon his sales had he been able to deliver the shooks but for the failure of appellant to furnish them as contracted for.

It is insisted that the only measure of damages that respondent can invoke is the difference between the contract price and the market price at the place of delivery under the contract, which was the "station of the seller," evidently meaning at the railway station near appellant's factory; and that, "The only exception to the rule that the measure of damage is the difference between the contract price and the market price is where the purchaser has contracted for the resale, the existence of which contract is known to the vendor at the time of making the contract, and then only is the vendor liable when the profits on the resale are reasonable." These contentions seem to be rested upon the fact that respondent did not have any contracts with his customers for the resale of the shooks at the time of contracting for them with appellant, from which it is argued that appellant could not then have contemplated any profits to be made by respondent upon resale of the shooks, and that the prospective

profits upon resale by respondent were too remote and spec-
ulative to be a proper measure of damages.   We think that
the measure of damages in such cases is not restricted within
the narrow limits insisted upon by counsel.   The general
rule of measure of damages growing out of a broken con-
tract is stated in the leading English case of *Hadley v. Bax-
endale*, 9 Exch. 341, 353, as follows:

"Where two parties have made a contract which one of
them has broken, the damages which the other party ought
to receive in respect of such breach of contract should be
such as may fairly and reasonably be considered either aris-
ing naturally, i. e., according to the usual course of things,
from such breach of contract itself, or such as may reason-
ably be supposed to have been in the contemplation of both
parties, at the time they made the contract, as the probable
result of the breach of it.   Now, if the special circumstances
under which the contract was actually made were communi-
cated by the plaintiffs to the defendants, and thus known to
both parties, the damages resulting from the breach of such
a contract, which they would reasonably contemplate, would
be the amount of injury which would ordinarily follow from
a breach of contract under these special circumstances so
known and communicated.   But, on the other hand, if these
special circumstances were wholly unknown to the party
breaking the contract, he, at the most, could only be sup-
posed to have had in his contemplation the amount of injury
which would arise generally, and in the great multitude of
cases not affected by any special circumstances, from such a
breach of contract."

This is probably as comprehensive a statement of the
general rule as can be found in any of the authorities, and
but few statements of general principles have been more uni-
formly approved by the courts.   Now can the loss of re-
spondent's profits upon resale of the shooks by him "reason-
ably be supposed to have been in the contemplation of both
parties, at the time that they made the contract, as the
probable result of the breach of it."   It seems to us that
there can be but one answer to this question, and that in the
affirmative.   It is clear from this record that appellant knew

that respondent was entering into the contract for the purpose of reselling the shooks to his customers in the middle western states, to the end that he would make a profit thereby. We are not here concerned with the question of unreasonable profits. It is not contended that respondent's prospective profits, which he lost because of appellant's failure to furnish the shooks, are unreasonable in amount, but only that such profits could not have been within the contemplation of the parties because no resales were then contracted for by respondent, and hence, at that time, could not have been a basis upon which the amount of such profits could be determined with any degree of accuracy, and that, therefore, the market value at the place where the shooks were to be delivered under the contract was the only proper measure of damages. There would be reason in this contention, so far as the amount of the profits is concerned, if no resale contracts had ever been made by respondent, furnishing a basis for determining the amount of his prospective profits. It seems to us, in this connection, that the thing which we are to determine is, did both parties, at the time of making the contract, have in mind and contemplate the making of a profit by respondent by a resale of the shooks? and not, whether or not they had in mind any particular amount of such profits. Clearly, appellant then knew that a failure to furnish the shooks would probably result in loss of profits to respondent. The fact that there were then no actual sales made by respondent, and therefore no existing basis upon which the amount of his profit could be determined, does not render any less certain the fact that the parties then had in mind the probability of future profits to respondent from a resale of the shooks. It is beyond controversy that appellant knew at the time that that was the sole inducement prompting respondent to contract for the shooks. The question of whether or not such prospective profits are too uncertain in amount to become a measure of damages in place of market value, when damages arise upon a breach of such a contract, has more to do with

the question of proof of the amount of such damages than with the question of the parties contemplating the probable making of profits by the purchaser, as we will see later.    In the case of *Trigg v. Clay*, 88 Va. 330, 13 S. E. 434, 29 Am. St. 723, we find a situation quite similar to that here involved, lumber being purchased for the purpose of reselling in the market, and damages claimed from the seller because of a failure to furnish the lumber.    At pp. 334-335, Justice Lacy, speaking for the court, says:

"A distinction is drawn in some of the cases between a resale made at an advance subsequent to a contract of purchase, and a resale made at an advance before the contract of purchase, which was known to the seller of the goods.    *Carpenter v. First National Bank*, 119 Ill. 354.

"This is rather a fanciful distinction.    It is not in accord with the ordinary usages of trade that a dealer—a man buying to sell again—should disclose his dealings with the same goods at a profit to his vendor.    But if there were any sound principle upon which this could rest—if the seller could be supposed to enter into his contract upon the basis of a resale in which he had no interest—still in this case it is reasonable to suppose that a lumber-getter, selling 700,000 feet of lumber to a dealer in lumber, should know (1) that it was for a resale; (2) that this resale was to be on a profit, and (3) that he should know that his vendee would be damaged to the amount of his profit if the vendor should prove faithless.  .  .  .

"Profits or advantages which are the direct and immediate fruits of the contract, entered into between the parties, are part and parcel of the contract itself, entering into and constituting a portion of its very elements, something stipulated for, and the right to the enjoyment of which is just as clear and plain as to the fulfilment of any other stipulation. They are presumed to have been taken into consideration and deliberated upon before the contract was made, and formed perhaps the only inducement to the arrangement. If the inducement to the plaintiffs to buy this lumber, they being lumber dealers and trading in lumber, was not the profits they were to make by a resale, what was their inducement?    And if the sellers did not understand and contem-

plate this resale on a profit, what contemplation on the subject can be reasonably ascribed to them? See *Masterlon v. Mayor of Brooklyn,* 7 Hill (N. Y.), 62; *Morrison v. Lovejoy,* 6 Minn. 224; *Fox v. Harding,* 7 Cush. (Mass.), 516; *Devlin v. Mayor &c.,* 63 N. Y. 8; *McAndrews v Tippitt,* 39 N. J. 105; *Kendall Bank Note Co. v. Commissioners of the Sinking Fund,* 79 Va. 563; *Bell v. Reynolds,* 78 Ala. 511.

"An examination of the cases will show that the courts have been endeavoring to establish rules by the application of which a party will be compensated for the loss sustained by the breach of contract—in other words, for the benefits and gain he would have realized from its performance, and nothing more."

It may be suggested that the fact that there was no market at which the purchaser in that case could procure lumber of the kind contracted for, permitted him to prove his damages by his loss of profits rather than market value. It is true that in the case before us we have no evidence of respondent's inability to procure shooks for his customers by purchasing them elsewhere, but it seems to us that if respondent could have so purchased shooks to supply his customers to the extent of the sales he had made to them, the burden was upon appellant to prove such fact. The opinion in *Trigg v. Clay, supra,* so indicates at page 333. It is true that respondent did purchase one car of shooks elsewhere to supply one of his customers, but that does not prove that he could have procured any more elsewhere. He had a right to rely upon the contract with the appellant; and when appellant breached the contract and thus prevented respondent from supplying his customers, it seems to us it would be more just to require appellant to prove that respondent could have procured the shooks elsewhere than to require respondent to prove that he could not do so. As to the one car load which he did procure elsewhere, it is evident that the jury did not award him any damages for loss of profits upon the sale supplied by that car. We think that respondent is not to be prevented from recovering damages,

measured by the loss of his prospective profits, by the mere fact that he did not have the resale of the shooks actually contracted for at the time of making the contract with appellant, and this brings us to the question of whether or not respondent is able to prove the amount of his prospective profit with sufficient certainty that the law will recognize their amount as a proper measure of damages. The certainty of the amount of such profits seems to be the principle thing in determining whether or not the law will regard them as a proper measure. If their loss is a proximate result of the breach of the contract, and they are not unreasonable in amount, and their amount can be proven with reasonable certainty, they are as proper a measure of damages as any other measurable loss resulting from a breach of the contract. The question here is, shall the prospective profits be excluded as a measure of damage because of their uncertainty? In the case of *Griffin v. Colver*, 16 N. Y. 489, 491, 69 Am. Dec. 718, Justice Sheldon, speaking for the court, said:

"It is a well established rule of the common law that the damages to be recovered for a breach of contract must be shown with certainty, and not left to speculation or conjecture; and it is under this rule that profits are excluded from the estimate of damages in such cases, and not because there is anything in their nature which should *per se* prevent their allowance. Profits which would certainly have been realized but for the defendant's default are recoverable; those which are speculative or contingent are not."

It is true that in that case the prospective profits were rejected as a measure of damages, but only because their amount was not capable of determination with any degree of certainty. In the same opinion, page 494, the learned justice quotes approvingly from an early edition of Sedgwick on Damages, as follows:

"The broad, general rule in such cases is, that the party injured is entitled to recover all his damages, including gains prevented as well as losses sustained; and this rule is subject

to but two conditions: The damages must be such as may fairly be supposed to have entered into the contemplation of the parties when they made the contract, that is, must be such as might naturally be expected to follow its violation; and they must be certain, both in their nature and in respect to the cause from which they proceed."

Mr. Freeman has a valuable note to this case in 69 Am. Dec. 724.

In 1 Sedgwick on Damages (8th ed.), § 174, the learned author says:

"The allowance of profits, when not excluded as unnatural or remote, is wholly a question of the certainty of proof. Wherever there is an interference with, or withholding of property, or breach of contract, or commission of a tort, the gain prevented, if provable, may be recovered. . . . We shall find that whenever expected profits become capable of certain proof, then they can be recovered."

See, also, 1 Sutherland on Damages (3d ed.), §§ 59 and 60; *Wolf Co. v. Galbraith*, 35 Tex. Civ. App. 505, 80 S. W. 848; *Chisholm & Moore Mfg. Co. v. United States Canopy Co.*, 111 Tenn. 202, 77 S. W. 1062.

We think that when respondent proved actual *bona fide* sales of the shooks which appellant had contracted to furnish him, there was thereby furnished a basis upon which the amount of his net profits could be determined by the jury with a sufficient degree of certainty to satisfy the conditions under which such profits become a proper measure of damage. The evidence was sufficient to warrant the jury in believing that *bona fide* sales had been contracted for by respondent sufficient to consume all of the shooks agreed to be furnished him under the contract with appellant, and that he was prevented from consummating such sales by appellant's failure to furnish the shooks under the contract. We are of opinion that the court was not in error in allowing the jury to measure respondent's damages by the amount of profits lost to him by appellant's breach of the contract.

It is contended that the court should have rendered judgment for appellant notwithstanding the verdict, upon motion therefor, because it appeared by respondent's evidence that, soon after the making of the written contract, the parties orally agreed that the specifications in the contract might be considered as modified to the extent that respondent should take under the contract as many panel ends as he could sell in place of the sawed ends. These panel ends were made somewhat differently from the sawed ends specified, but they served the same purpose. It is argued that this evidence showed that the contract as finally made between the parties became in effect an oral contract, and hence, void and unenforceable under the statute of frauds, because of the amount involved. This contention is evidently rested upon Rem. & Bal. Code, § 5290, which reads as follows:

"No contract for the sale of any goods, wares, or merchandise, for the price of fifty dollars or more, shall be good and valid, unless the purchaser shall accept and receive part of the goods so sold, or shall give something in earnest to bind the bargain, or in part payment, or unless some note or memorandum in writing of the bargain be made and signed by the party to be charged thereby, or by some person thereunto by him lawfully authorized."

It might well be argued that this change in the specifications was too slight to be regarded as such a change in the written contract as to make it in effect a new oral one. But there was another fact shown by the record that we think saves the contract from the statute above quoted. It clearly appears that a considerable number of panel ends were furnished by appellant to respondent and paid for in compliance with this understanding. This, we think, is sufficient in any event to prevent the contract becoming void under this statute.

It is contended that appellant's motion for judgment notwithstanding the verdict should have been granted, because appellant was not required to furnish any more shooks after

it had declined to do so because of respondent's failure to pay the balance due on those already furnished. The earliest date shown by the record when appellant assigned this as a reason for not furnishing more shooks was June 21st, 1909, which was only a few days before the expiration of the contract time for furnishing all the shooks contracted for. We think there was sufficient evidence of damage occurring before this time, arising by failure to furnish shooks under the contract, to support the finding of the jury as to the amount of damages awarded respondent.

It is contended that appellant's motion for judgment notwithstanding the verdict should have been granted because respondent had not filed with appellant orders for one-half or more of the entire amount of shooks contracted for, before January 20, 1909, as the contract seems to contemplate. It is plain from the evidence that up to January 20th respondent had already filed more orders than appellant had filled, and that appellant was then behind in fulfilling its obligation under the contract. It is also plain that the parties proceeded thereafter under the contract without either declining to perform for this reason. Other errors are assigned, but they are presented to us practically without argument or citation of authorities. We think it sufficient to say they are without merit.

We find no prejudicial error in the record, and therefore affirm the judgment.

DUNBAR, C. J., MOUNT, FULLERTON, and GOSE, JJ., concur.